NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4309-13T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

STEPHON G. WRIGHT,

     Defendant-Appellant.

_____

```
+---------------------------+
|  APPROVED FOR PUBLICATION |
|                           |
|     February 29, 2016     |
|                           |
|     APPELLATE DIVISION    |
+---------------------------+
```

        Submitted December 7, 2015 — Decided February 29, 2016

        Before Judges Sabatino, Accurso and
        O'Connor.

        On appeal from Superior Court of New Jersey,
        Law Division, Hudson County, Indictment No.
        12-11-2039.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Michele E. Friedman,
        Assistant Deputy Public Defender, of counsel
        and on the brief).

        Esther Suarez, Hudson County Prosecutor,
        attorney for respondent (Rookmin Cecilia
        Beepat, Assistant Prosecutor, on the brief).

    The opinion of the court was delivered by

ACCURSO, J.A.D.

    Following the denial of defendant Stephon G. Wright's

motions to exclude the testimony of the victim identifying

Wright as the man who robbed him at gunpoint and to suppress statements Wright made to the police, he entered a conditional guilty plea pursuant to a negotiated agreement to first-degree armed robbery, N.J.S.A. 2C:15-1; and was sentenced to eight years in state prison subject to the periods of parole ineligibility and supervision required by the No Early Release Act, N.J.S.A. 2C:43-7.2.  He appeals pursuant to Rule 3:9-3(f), contending the court erred in denying his motions and, in the alternative, that his sentence is excessive.  He frames the issues as follows:

> POINT I
>
> THE COURT BELOW COMMITTED REVERSIBLE ERROR IN DENYING THE MOTION TO SUPPRESS THE IDENTIFICATION, AS [THE VICTIM'S] OUT-OF-COURT IDENTIFICATION PRESENTED A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION, AND THE IDENTIFICATION PROCEDURE WAS NOT PROPERLY RECORDED. (Partially Raised Below).
>
> POINT II
>
> MR. WRIGHT WAS NOT APPRISED OF HIS MIRANDA RIGHTS PRIOR TO BEING SUBJECTED TO A CUSTODIAL INTERROGATION, AND THEREFORE, THE COURT BELOW ERRONEOUSLY DENIED HIS MIRANDA MOTION.
>
> POINT III
>
> THE MATTER SHOULD BE REMANDED FOR RESENTENCING.
>
> A.  The Sentencing Judge Engaged in Double Counting.

A-4309-13T2

B.  The Sentencing Court Erred in Finding
Aggravating Factors Three, Six, and Nine.

We find no error in the court's decision to admit the identification evidence under the test established in State v. Henderson, 208 N.J. 208 (2011), and thus reject defendant's arguments on that point.  We also reject Wright's arguments regarding his sentence.  We agree, however, that his statements to the police were the product of the equivalent of custodial interrogation without required Miranda[1] warnings and should have been suppressed.  Accordingly, we reverse the court's decision to admit the statements and remand for further proceedings.

The Pre-trial Hearing

Walking home from the Journal Square PATH station in Jersey City at about three a.m. in the middle of the summer, three brothers were accosted by a man on a bicycle.  The man pointed a silver gun at them and demanded they give him what they had in their pockets.  The brothers handed over an iPhone and about fifteen dollars.  After the man rode off, the young men hurried toward their uncle's house and used a cell phone they had not relinquished to call the police.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

In addition to providing the police a description of their assailant, the young men used an "app" to track the stolen phone to the area of Grand and Prescott Streets. Jersey City police officers Andrek and Harrison were dispatched to that location to search for an armed black male, approximately 5'6" or 5'7", wearing a white t-shirt and grey sweats and riding a blue bike. They shortly came across an open garage with three or four people lounging inside. A blue bike rested on the ground nearby.

The officers drew their weapons and entered the garage. Although none of the occupants claimed ownership of the bike, the officers noticed one man, later identified as defendant, who appeared nervous and matched the description of the robber. The officers separated him from the group to speak to him outside the garage. Officer Andrek testified at the hearing that the officers immediately informed defendant he was being detained because he fit the description of the perpetrator of an armed robbery that had just taken place near Journal Square. He also radioed the precinct they had a suspect.

Three other officers arrived as backup within a minute or so. Officer Andrek detained defendant outside the garage, while Officer Harrison joined the three newly arrived officers in a search of the area. Shortly thereafter, Andrek was advised by

radio that Detective Frascino was en route to the garage with one of the victims to see whether he could identify defendant. Andrek testified he relayed that information to defendant.

Before the victim arrived, however, one of the other officers found a gun in an alleyway two houses away from where Officer Andrek was holding defendant. Andrek testified that when he was informed a gun had been recovered, he relayed that information to defendant as well. That testimony led to the following exchange:

> Prosecutor: What, if anything, was Mr. Wright[']s reaction, expression, however you want to word it, when you informed him of these two things?
>
> Officer Andrek: His expression was so — he was caught. He put his head down and sighed, and then he said fuck you, I got the cell phone, it's over there. And he motioned his head towards the direction of the gun.

The prosecutor followed up with this question.

> Prosecutor: And, again, this wasn't based on questioning by you or [Officer] Harrison, this was Mr. Wright saying this only after you informed [him] the victim was on the way, and the handgun was recovered?
>
> Officer Andrek: Correct.

Although the officer conceded on cross-examination that it would have been "prudent" to have advised defendant of his rights when the officer began "relaying information to [defendant] about the

sequence of the investigation," defendant was only administered his Miranda rights after he admitted possessing the cell phone.

Following Wright's admission, officers quickly recovered the phone in an alley near where the gun was found and radioed the information to the other units involved in the investigation. The victim heard that radio transmission while seated in the back seat of Detective Frascino's car on the way to the showup. The victim testified he also heard over the radio the police had recovered the gun as well. He claimed that not only had he heard other officers had recovered his cell phone before they arrived at the place the police were holding defendant, but that Detective Frascino told him that as well.[2]

The victim testified that when they arrived at the showup, he remained in the car while some officers stood nearby with a man in handcuffs whom they said was "the guy we found with the phone" and asked, "is this the guy who robbed you[?]" He testified he was "positive" that defendant was "the right guy" and that the entire incident, from robbery to identification, took place in less than an hour. In response to the judge's

[2] The witness gave different answers to similar questions posed by the prosecutor and defendant's counsel, leading the judge to comment at one point that "he's saying yes to any question he's being asked if you ask me." Having read the entire transcript of this hearing, we can confidently say that none of those testifying was a model witness, as all had difficulty either recalling or relating basic information.

question of whether "the fact that you heard about the phone being recovered have any impact on your identification at all," the victim said, "No it didn't."

Detective Frascino testified that he explained the identification procedure to the victim,[3] but denied telling him the suspect had been found with the phone at the time of the showup. Instead the detective maintained the information that the phone had been located "came over the air, and [the victim] was excited in the car and said they found my phone, and I only stated that that's what they said over the air." The detective also testified defendant was in handcuffs when they arrived for the showup, but that he had the cuffs removed before walking defendant to the car for the victim's identification. He did allow, however, that it was possible the victim saw defendant in handcuffs when they first pulled up.

---

[3] The detective claimed he explained to the victim:

> that we were [en] route to a location where
> there would be a subject that we want him to
> — that I would like him to take a look at.
> And when we get there, when you look at him
> you tell me if there's anything about him
> that he can tell me regarding that subject.

The detective made no mention of having warned the victim that the suspect might not have been the perpetrator and that the victim should not feel compelled to make an identification, as is required by the Attorney General Eyewitness ID Guidelines and Henderson. See Henderson, supra, 208 N.J. at 261, 276-78.

Trial Court Opinion

The judge issued a written opinion denying the Wade[4] motion. After summarizing the testimony of the witnesses and reviewing the Supreme Court's discussion of system and estimator variables[5] in Henderson, the judge found that without doubt the showup was impermissibly suggestive. He wrote:

> After extensive questioning by the attorneys and the Judge, the victim stated that he was told "they have the person who has the phone." The victim specifically stated that the Officers told him this prior to showing him the suspect. The "suspect" was brought to the police car in handcuffs and positively identified as the perpetrator. There was only one individual that was brought to the unmarked vehicle for identification. These factors conveyed to [the victim] that the police believed they had the robber.

Notwithstanding the impermissible suggestiveness of the showup, the judge concluded the victim's identification of defendant as the man who robbed him and his brothers was

---

[4] United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967).

[5] "System variables" are factors relating to the identification that are within the State's control and include such things as lineup or showup construction, blind administration, pre-identification instructions, avoiding feedback and recording confidence. "Estimator variables" are factors over which the State has no control as they relate to the witness, the perpetrator, or the event itself and include such things as distance and lighting, duration, weapon focus, race bias and stress. Henderson, supra, 208 N.J. at 248-67.

nevertheless sufficiently reliable to permit its admission. The judge noted that the two men stood only three feet apart during their encounter and exchanged words, giving the victim a good look at the robber. He also noted the victim's identification was "highly accurate as to the race, height, facial hair,[6] and clothing," and was made within an hour of the robbery.

The judge acknowledged other estimator variables that could affect the reliability of the identification, including the presence of a gun, which he found "could have distracted the victim's focus on the perpetrator's face." Having considered both the suggestiveness of the showup and the estimator variables, the judge concluded based on the witnesses' testimony "that the victim made the identification from his own independent recollection" and that it "was not tainted in any significant way by the suggestive identification procedure."

The judge also denied defendant's motion to exclude his statements to the police, but did so in an oral opinion. He concluded custody was not in issue as "defendant was actually detained [outside the garage] and, therefore, legally and

---

[6] The victim testified the robber sported a goatee. He also noted the man had short hair. There was no mention of a hat or anything else that might have impeded the victim's view of the robber's face and hair. See Henderson, supra, 208 N.J. at 266 (noting the special master's finding that "[d]isguises (e.g., hats, sunglasses, masks) are confounding to witnesses and reduce the accuracy of identifications").

technically in custody." The judge accordingly concluded that the officers would have been obligated to have administered <u>Miranda</u> warnings to defendant "if he was to be interrogated." The judge determined, however, that defendant was not interrogated.

> I don't believe that the action of the police in advising him what was going on would have caused them to reasonably expect to elicit from him an incriminating response as to where the phone was. I just don't find it to be a functional equivalent of interrogation as per the <u>Ward</u>[7] case . . . .
>
> [The officers] . . . did nothing to elicit the response from [defendant] indicating where the phone was. That's something he blurted out based upon all the circumstances of what's going on and, frankly, it's probably something common that happens in human nature, you just — you know, it is what it is.
>
> So I don't find that his constitutional rights were violated by virtue of the fact he was not Mirandized, as in fact . . . the police comment did not constitute an interrogation or the functional equivalent of an interrogation. Nothing was done to elicit a response by the police.

Accordingly, the judge denied defendant's motion.

### Standard of Review

Our standard of review on a motion to bar an out-of-court-identification (or a statement made without benefit of <u>Miranda</u>

---

[7] <u>State v. Ward</u>, 240 <u>N.J. Super.</u> 412 (App. Div. 1990).

A-4309-13T2

warnings) is no different from our review of a trial court's findings in any non-jury case. See State v. Johnson, 42 N.J. 146, 161 (1964). "The aim of the review at the outset is . . . to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." Id. at 162. As with our review of the fact finding on other pre-trial motions in a criminal case, the "trial court's findings at the hearing on the admissibility of identification evidence are 'entitled to very considerable weight.'" State v. Adams, 194 N.J. 186, 203 (2008) (quoting State v. Farrow, 61 N.J. 434, 451 (1972)); see also State v. Locurto, 157 N.J. 463, 470-71 (1999).

Our Supreme Court has long held that "[a]n appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses . . . .'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting Johnson, supra, 42 N.J. at 161). That deference is grounded in the understanding that our "reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand." State v. Nash, 212 N.J. 518, 540 (2013). Appellate review of the trial court's application of the law to the facts, however, is plenary. State v. Coles, 218 N.J. 322, 342 (2014);

11                                                                              A-4309-13T2

see also <u>State v. Jones</u>, ___ <u>N.J.</u> ___, ___ (2016) (slip op. at 19-20).

<u>Identification Issue</u>

We turn first to defendant's contention that the trial court erred in admitting the victim's out-of-court identification.  There is no dispute that under the <u>Henderson</u> framework, which applied in this case, the inherent suggestibility of a showup entitled defendant to a <u>Wade</u> hearing.  <u>See</u> <u>Henderson</u>, <u>supra</u>, 208 <u>N.J.</u> at 261 ("showups, while sometimes necessary, are inherently suggestive").  With "actual proof of suggestiveness" supplied by the showup, augmented by the victim's credible testimony that the officers told him before he viewed the suspect that they had the person who had his phone, the court was required to consider both system variables and estimator variables in evaluating the overall reliability of the identification in determining its admissibility.  <u>See</u> <u>id.</u> at 291.

The court identified several system variables that could have affected the reliability of this identification.  Beyond the inherent suggestibility of the showup itself, the court noted the victim heard the police radio transmissions that officers had recovered his cell phone and found a gun minutes before he was asked to identify the suspect.  The victim

testified that the detective told him the police "have the person who has the phone" and that the suspect was walked toward the car in handcuffs.

Exploring the estimator variables at the hearing as Henderson requires, see id. at 293, the court noted that the presence of a gun certainly "could have distracted the victim's focus on the perpetrator's face."[8]  It found other estimator variables, however, that could positively affect the reliability of the identification, including that the victim stood within three feet of the perpetrator and that the two exchanged words, which allowed the victim to get a good look at his assailant. The court further noted that the identification was made shortly after the encounter, within an hour according to both the police and the victim.  The court emphasized that the victim was able to provide police with a "highly accurate" description of the

_____

[8] The judge included among estimator variables two we believe are more appropriately characterized as system variables, the victim's overhearing of the radio transmissions and the suspect's presence in handcuffs.  He also included in his discussion of the variables the victim's lack of motivation to lie.  Motivation to lie goes to a witness's credibility, not to the reliability of an identification.  See Raheem v. Kelly, 257 F.3d 122, 140 (2d Cir. 2001), cert. denied, 534 U.S. 1118, 122 S. Ct. 930, 151 L. Ed. 2d 892 (2002) ("Reliability, in the identification context, means essentially that the witness's recollection was 'undistorted.'").  The question for the court was whether the victim's identification of defendant was distorted by system or estimator variables leading to a substantial likelihood of misidentification.

A-4309-13T2

perpetrator's race, height, clothing and facial hair, as well as the color and type of bicycle he was riding.[9]

Weighing the system and estimator variables present in this record led the court to find that although "the identification procedure was impermissibly suggestive," it could not conclude that defendant had proved a "very substantial likelihood of an irreparable misidentification" as was his burden.  Id. at 289 ("[I]f after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable

---

[9] There is evidence of other estimator variables in the record not mentioned in the court's findings that could further support admission of the identification in this case.  The victim and defendant were both young men of approximately the same age. See Henderson, supra, 208 N.J. at 265 (discussing effect of age on reliability of an identification).  They may also have been of the same race, as no argument was raised as to cross-racial recognition affecting the reliability of the identification. Id. at  267.  We do not rely upon either "fact," we merely note them as estimator variables that should be identified and analyzed under the Henderson framework.
Similarly, the court made no mention of Detective Frascino's failure to have warned the victim that the suspect might not have been the perpetrator, and that the victim should not feel compelled to make an identification, as is required by the Attorney General Eyewitness ID Guidelines.  See supra, note 3.  Although the Court in Henderson rejected the notion that violation of the Attorney General Guidelines would require per se exclusion of the resulting eyewitness identification, pre-identification instructions are a critical system variable that must be weighed on a Wade motion under the revised Henderson framework.  See Henderson, supra, 208 N.J. at 250, 261, 290, 292-93.

misidentification, the court should suppress the identification evidence."). Defendant contends that we should reverse because the court "improperly balanced the system and estimator variables adduced during the Wade hearing." We reject that argument.

Although the Henderson Court noted the enhanced framework it established for admission of identification testimony "may provide a greater role [for appellate review] in certain cases," id. at 295, we do not conclude the Court intended by that observation to endorse a standard that would allow us to set aside findings that have adequate support in the record, as these do.[10] To be sure, the Court in Henderson continued to endorse its conclusion in State v. Herrera, 187 N.J. 493, 504 (2006), that showups are inherently suggestive. Henderson, supra, 208 N.J. at 261; see also Jones, supra, ___ N.J. at ___ (slip op. at 22). It did not, however, limit their

---

[10] We do not draw any different conclusion from the Court's de novo review of "whether constitutional due process requirements should have compelled the exclusion of an out-of-court identification from defendant's criminal trial" in Jones. Jones, supra, ___ N.J. at ___ (slip op. at 19). The Court in Jones was addressing errors in the legal analysis of the identification testimony adduced at trial. Specifically, the error of considering extrinsic evidence of guilt when analyzing the independent reliability of an inherently suggestive identification procedure. Id. at 9-10. Appellate review of the application of the law to the facts is always plenary. See Coles, supra, 218 N.J. at 342.

admissibility, instead noting the special master's finding that "'the risk of misidentification is not heightened if a showup is conducted immediately after the witnessed event, ideally within two hours' because 'the benefits of a fresh memory seem to balance the risks of undue suggestion.'"  Henderson, supra, 208 N.J. at 259 (quoting Report of the Special Master at 29, Henderson, supra, 208 N.J. 208 (No. A-8-08)); see also Jones, supra, ___ N.J. at ___ (slip op. at 22) (noting "[o]ur law has permitted 'on or near-the-scene identifications because they are likely to be accurate, taking place . . . before memory has faded and because they facilitate and enhance fast and effective police action and they tend to avoid or minimize inconvenience and embarrassment to the innocent.'") (quoting Herrera, supra, 187 N.J. at 504).

     We recognize, of course, that the inherent suggestibility of a showup was compounded in this instance by several system variables, most notably the witness hearing the radio transmissions and the detective's failure to try to neutralize the harm by declining to confirm the information and warning the witness that the suspect may not be the perpetrator and that he should not feel compelled to make an identification, and instead telling him they had "the person who has the phone."  We also acknowledge that neither counsel nor the court was accustomed to

16

working within the <u>Henderson</u> framework.  The failure of the
court to discuss the detective's neglect to warn the witness
that the suspect might not be the perpetrator and he should not
feel compelled to make an identification is particularly
concerning in light of the other system failures in this
showup.[11]

The central point of <u>Henderson</u> is the recognition that
suggestive identification procedures can skew a witness's report
of his opportunity to view the crime, his degree of attention,
and, most importantly perhaps, his level of certainty at the
time of the identification.  208 <u>N.J.</u> at 286.  Thus it is
critical that the court identify particular police procedures —
the system variables — and consider whether and to what extent
any may have distorted the witness's perception at the time of
the identification and the witness's certainty as to the
identification thereafter.  The court is to weigh those system
variables along with any applicable estimator variables, some of
which are also capable of altering memory and thus tainting an
identification, in determining, based on the totality of the

---

[11] We acknowledge, however, that the court's finding that the
showup was impermissibly suggestive because the police
communicated to the victim "that the police believed they had
the robber" would certainly encompass the failure to provide the
instruction required by the Attorney General Guidelines and
<u>Henderson</u>.

circumstances, whether defendant has carried his burden to demonstrate "a very substantial likelihood of irreparable misidentification." Id. at 289.

Here, the trial court, after listening to the testimony and weighing the factors, concluded defendant had not demonstrated that very substantial likelihood and that it would be for the jury to decide whether the victim credibly identified defendant, guided by enhanced instructions on eyewitness testimony from the trial judge.[12] See Model Jury Charge (Criminal), "Identification: Out-of-Court Identification Only" (2012); State v. Lazo, 209 N.J. 9, 24 (2012). The court based its ruling on the victim's ability to see the robber and provide a "highly accurate" description of him less than an hour before he was called on to make his identification. Although finding the police impermissibly signaled the victim in a variety of ways that "the police believed they had the robber," the court concluded the

_____

[12] Underscoring the importance of jurors understanding the complicated issues underlying the reliability of eyewitness identification evidence the Court identified in Henderson, it directed the Criminal Practice Committee and the Committee on Model Criminal Jury Charges to develop an enhanced jury charge on eyewitness identification for the Court's review prior to its implementation. Henderson, supra, 208 N.J. at 296-99. The resulting three new charges became effective September 2012. See Model Jury Charge (Criminal), "Identification: In Court and Out-of-Court Identifications" (2012); Model Jury Charge (Criminal), "Identification: In Court Identification Only" (2012); Model Jury Charge (Criminal), "Identification: Out-of-Court Identification Only" (2012).

circumstances made misidentification unlikely. Mindful that we are reviewing a cold record and that the trial court's factual findings are "entitled to very considerable weight," Adams, supra, 194 N.J. at 203, we find no basis to disturb those findings and affirm the trial court's denial of the motion to suppress the identification made by the victim.[13] See Elders, supra, 192 N.J. at 244.

### Delgado Claim

Defendant also contends, in an argument not raised to the trial court, that the out-of-court identification should not have been admitted under State v. Delgado, 188 N.J. 48, 63 (2006), which conditions admissibility on adequate documentation of the identification procedure. See also R. 3:11. Specifically, defendant argues that "[t]he absence of even a single report regarding 'the dialogue between the witness and the interlocutor,' . . . renders [the victim's] out-of-court identification inherently suspect and per se inadmissible."

---

[13] Nor do we conclude that police missteps in cuing the witness that they believed defendant was the perpetrator rose to the level of a due process violation. See Jones, supra, ___ N.J. at ___ (slip op. at 36-37) (holding that making suspect wear a distinctive plaid jacket he was not wearing when apprehended "rendered the showup and the identification evidence that it generated a violation of defendant's due process rights, requiring a new trial").

A review of the transcripts makes clear that at least three reports were created by the police regarding the investigation of this crime. Although extensive use of these reports was made at the hearing and they were identified in the record, they were not admitted in evidence and are not included in the record on appeal. Accordingly, we are unable to assess defendant's argument that the police failed to adequately document the identification procedure in violation of Delgado.

Because this issue was not raised to the trial court,[14] it is defendant's burden to demonstrate that the police failed to create an adequate record of the showup in those reports and that such failure was clearly capable of producing an unjust result. See R. 2:10-2; Delgado, supra, 188 N.J. at 64; State v. Macon, 57 N.J. 325, 337 (1971). As defendant has not included

_____

[14] We also question whether this issue was properly reserved for review. Although plaintiff conditioned his plea on his ability to appeal his "Wade [and] Miranda" motions, he did not make the Delgado claim part of his Wade motion. It is difficult to conceptualize a defendant conditioning his guilty plea on his ability to appeal a claim he did not make, let alone grant appellate relief to a defendant in such circumstances. Cf. State v. Szemple, 332 N.J. Super. 322, 328-29 (App. Div.) (noting we do not ordinarily review a defendant's claims following a guilty plea beyond those contentions specifically preserved for appeal), certif. denied, 165 N.J. 604 (2000). Cf. R. 3:5-7(d) (preserving, by contrast, an automatic right to appellate review of orders denying motions to suppress physical evidence). Our disposition of the claim makes further consideration of this issue, which was not addressed by the parties, unnecessary.

the reports referenced in the record, thereby precluding us from assessing the merits of the claim, we reject his argument.

### Miranda Issue

We turn now to defendant's argument that his statements to the police should have been suppressed. It is beyond well settled that "every natural person has a right to refuse to disclose . . . to a police officer . . . any matter that will incriminate him or expose him to a penalty . . . ." N.J.S.A. 2A:84A-19; N.J.R.E. 503. "New Jersey's privilege against self-incrimination is so venerated and deeply rooted in this state's common law that it has been deemed unnecessary to include the privilege in our State Constitution." State v. O'Neill, 193 N.J. 148, 176 (2007). The Court has treated "our state privilege as though it were of constitutional magnitude, finding that it offers broader protection than its Fifth Amendment federal counterpart." Id. at 176-77. Miranda warnings safeguard our state law privilege as they do the Fifth Amendment. Id. at 185.

The United States Supreme Court has made clear that Miranda warnings are required "whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297, 308 (1980). Our Supreme Court

acknowledged the "functional equivalent" of interrogation rule of Innis in State v. Bey, 112 N.J. 45, 68 n.13 (1988) (holding "[t]he initiation of a general discussion about the victim clearly satisfies" the Innis standard); see also State v. Hubbard, 222 N.J. 249, 267 (2015). As the State has conceded that defendant was in custody when he made the incriminating statement about the cell phone, the only issue presented to the trial court, and the one we review, is whether Officer Andrek's statements to defendant informing him, first, that the victim was coming over to identify him, and then, that other officers had found a gun nearby was the "functional equivalent" of an interrogation.

The Supreme Court in Innis, explained that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [whether inculpatory or exculpatory] from the suspect." 446 U.S. at 301, 100 S. Ct. at 1689-90, 64 L. Ed. 2d at 308 (footnotes omitted). The Court explained its reasoning thus:

> The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that

> the <u>Miranda</u> safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they <u>should have known</u> were reasonably likely to elicit an incriminating response.
>
> [<u>Id.</u> at 301-02, 100 <u>S. Ct.</u> at 1690, 64 <u>L. Ed.</u> 2d at 308 (footnotes omitted).]

We applied the <u>Innis</u> rule in <u>State v. Ward</u>, 240 <u>N.J. Super.</u> 412 (App. Div. 1990). <u>Ward</u> involved a robbery of a mini-mart in Newark by three males, one of them a juvenile. Two of the robbers, Kevin Miller and the juvenile, S.S., fled in a car and were quickly apprehended by police. Miller implicated Ward, who was then identified by one of the victims in a photo array. The following week, a detective investigating the robbery learned that Ward was in custody on an unrelated charge. The detective went to Ward's cell with photographs of Miller and S.S. The detective showed Ward the pictures and, without giving him <u>Miranda</u> warnings, told him he was going to be charged with the robbery of the mini-mart, and that Miller and S.S. had already been arrested. Ward looked at the pictures and told the

detective, "I don't know Kevin Miller and [S.S.]." Id. at 416. The detective had not mentioned either name to Ward. The detective immediately read Ward his Miranda rights. Ibid. Ward refused to sign the waiver card and insisted he knew nothing about any robbery. Ibid.

We determined that the detective's confrontation with Ward had been the functional equivalent of an interrogation, and that Ward's response "was not simply a spontaneous outburst elicited casually or innocently without the State's purposeful enticement or encouragement." Id. at 417. "[M]indful that 'the modern practice of in-custody interrogation is psychologically rather than physically oriented,'" ibid. (quoting Miranda, supra, 384 U.S. at 448, 86 S. Ct. at 1614, 16 L. Ed. 2d at 708), Judge King wrote that

> the Detective's undertaking . . . was
> designed to elicit a response, both helpful
> to the investigation and incriminatory of
> his suspect. . . . Defendant should have
> been given the Miranda warnings before, not
> after, the Detective started the process so
> clearly designed to entangle the defendant
> in the criminal event.
>
> [Id. at 418.]

We concluded that a scrupulous respect of Ward's rights would have required Miranda warnings before the detective confronted Ward in his cell, told him of the robbery and of the formal

charge against him, and then showed him the pictures. Id. at 419. We come to a similar conclusion here.

Officer Andrek testified he provided defendant information at three different times while defendant was in custody outside the garage before providing him Miranda warnings. Upon escorting defendant out of the garage, Andrek advised defendant he was being detained because he fit the description of the perpetrator of an armed robbery that had just taken place near Journal Square. Several minutes later, Andrek advised defendant that one of the victims was being brought over to see if the victim could identify him. Some minutes after that, Andrek advised defendant that officers searching the area had located a gun a few doors down from where they stood.

The trial judge concluded on the basis of that testimony that Officer Andrek "did nothing to elicit the response from [defendant] indicating where the phone was." Instead the judge found it was "something [defendant] blurted out based upon all the circumstances of what's going on and, frankly, it's probably something common that happens in human nature, you just — you know, it is what it is."

We agree that it is not surprising that defendant "blurted out" an expletive and acknowledged he had the cell phone "based upon all the circumstances" transpiring. Defendant knew police

25                                                                A-4309-13T2

suspected him of the armed robbery. Upon being provided with the additional information that a detective was bringing over one of the victims to identify him, and that other officers had found the gun nearby, defendant, as Officer Andrek testified, knew "he was caught." The common human experience we understand the judge was referring to is one of the tightening of a noose. The officer offered no explanation for supplying defendant with these updates on the investigation, which clearly were not inadvertent, see State v. Bohuk, 269 N.J. Super. 581, 594-95 (App. Div.), certif. denied, 136 N.J. 29, cert. denied, 513 U.S. 865, 115 S. Ct. 183, 130 L. Ed. 2d 117 (1994), and appear designed to elicit a response. See Ward, supra, 240 N.J. Super. at 418. It is precisely because defendant's response is so readily understandable that we find the officer should surely have known that his meting out of the information in the way he did was reasonably likely to evoke an incriminating response, and thus that it amounted to an interrogation.

To be clear, like the trial judge, we see no objection to the officers' initial statements to defendant about why he was being detained. If defendant had at that point blurted out that he had the cell phone, we would not hold the officers accountable for such an unforeseeable result. See Innis, supra, 446 U.S. at 301-02, 100 S. Ct. at 1689-90, 64 L. Ed. 2d at 308;

see also State v. Melendez, 423 N.J. Super. 1, 30 (App. Div. 2011), certif. denied, 210 N.J. 28 (2012); State v. Lozada, 257 N.J. Super. 260, 268-69 (App. Div.), certif. denied, 130 N.J. 595 (1992); State v. Mallozzi, 246 N.J. Super. 509, 516 (App. Div. 1991).

Here, however, Officer Andrek continued well beyond his initial communication informing defendant of the reasons for his detention. The officer's actions in continuing to engage defendant by providing him updates on the progress of the investigation were unnecessary, and the officer should have known they would be likely to elicit an incriminating response, either exculpatory or inculpatory. See Innis, supra, 446 U.S. at 301 n.5, 100 S. Ct. at 1689 n.5, 64 L. Ed. 2d at 308 n.5. They should not have been undertaken prior to providing defendant with Miranda warnings. Accordingly, we reverse the decision to admit defendant's statements to the police and remand for further proceedings consistent with this opinion.

## Defendant's Sentence

Because our decision does not mandate the reversal of defendant's conviction, but only allows him the opportunity to withdraw his guilty plea, R. 3:9-3(f); State v. Cummings, 184 N.J. 84, 100 (2005), we address, and reject, his arguments regarding his sentence.

A-4309-13T2

Our review of a trial court's sentencing determination is both limited and deferential.  State v. Fuentes, 217 N.J. 57, 70 (2014).  That is particularly true where defendant has bargained for the sentence imposed pursuant to a plea agreement.  Id. at 70-71.  Having reviewed the sentencing transcript, we are convinced that defendant's arguments that the judge double-counted the use of a gun in the commission of the armed robbery and erred in finding aggravating factors three, six, and nine are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).  We are satisfied the judge's findings and balancing of the aggravating and mitigating factors are supported by adequate evidence in the record, and the sentence is neither inconsistent with sentencing provisions of the Code of Criminal Justice nor shocking to the judicial conscience.  See Fuentes, supra, 217 N.J. at 70; State v. Bieniek, 200 N.J. 601, 608 (2010); State v. Cassady, 198 N.J. 165, 180-81 (2009).

## Conclusion

The decision to admit the identification evidence is affirmed.  The decision to admit defendant's statements to the police is reversed and the matter is remanded to the trial court, where defendant may elect either to withdraw his plea and proceed to trial with his statements to the police excluded, or

to accept his earlier conviction and sentence.  We do not retain jurisdiction.

Affirmed in part; reversed in part and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

29

A-4309-13T2