**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4003-17T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

DURRELL HEARD, a/k/a
DURRELL A. HEARN,

 Defendant-Appellant.

_____

Submitted November 9, 2020 - Decided January 13, 2021

Before Judges Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Criminal Division, Essex County, Indictment No. 15-08-1935.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel S. Rockoff, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney for respondent (Emily M. M. Pirro, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from the denial of his motion to suppress the out-of-court identifications and from his conviction after a jury trial. He also challenges his sentence, asserting it is inconsistent with the verdict, and the judgment of conviction (JOC) differs from the orally pronounced sentence. We affirm.

I.

Defendant was charged in an indictment with first-degree murder, contrary to N.J.S.A. 2C:11-3a(1)-(2) (count one); second-degree conspiracy to commit robbery, contrary to N.J.S.A. 2C:5-2 (count two); three counts of first-degree robbery, contrary to N.J.S.A. 2C:15-1 (counts three, four, and five); first-degree felony murder, contrary to N.J.S.A. 2C:11-3a(3) (count six); second-degree unlicensed possession of a firearm, contrary to N.J.S.A. 2C:39-5(b) (count seven); and second-degree possession of a firearm for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a) (count eight).

A.

The charges arose out of events that took place on January 8, 2015 in a fast food restaurant where defendant and co-defendant Leon Trent robbed several individuals – Tyreese Barkley, Jahod Onque, and Tykwan Crenshaw –

2

and defendant shot and killed Crenshaw.[1]  At the time, Hasim Salimi was working in the restaurant and he witnessed the shooting.

After the shooting, Barkley gave a statement to police.  He described the shooter as 6'2", with brown skin, dreadlocks, and wearing a vest over a sweatshirt.  Barkley described the accomplice as heavyset, dressed all in black, and with a black do-rag on his head.

Salimi also gave an initial statement to police that day.  Salimi said he saw several people, including defendant, in his restaurant just prior to the shooting. He stated he was in the back area of the restaurant near the freezer when he heard a gunshot.  Although he could not see the shooter at that point, he did see Crenshaw holding his hands up, saying "no, no, no" and then falling to the floor. Salimi ran closer and saw defendant with his right arm down at a 45-degree angle towards Crenshaw who was laying on the floor.  He described the shooter as six feet tall with an average build.  He said the shooter had dreadlocks and was wearing a vest.

In the days after the shooting, Essex County Prosecutor's Office (ECPO) detectives retrieved surveillance footage from the area of the restaurant in the minutes before and just after the homicide.  In their review of the footage, the

---

[1] Trent was charged in counts two, three, four, five, and six of the indictment.

detectives spotted two individuals who matched the descriptions Barkley and Salimi had given of the perpetrators in their initial statements. A detective from Irvington identified the men in the surveillance footage as Trent and defendant. The detectives made some still photographs of defendant and Trent from the footage.

A week after the shooting, the police asked Salimi to come to the ECPO. When he arrived, Salimi gave a second recorded statement to Detectives David Fontoura and James Ventola. His description of the events was similar to his first statement – he was in the back of his store, heard one shot, ran to the front, and saw defendant shoot Crenshaw a second time. He also described how the accomplice seemed to be standing as a lookout and added that he heard defendant say "you robbed my man last week" before shooting Crenshaw.

Fontoura showed Salimi the still photo, stating: "My partner . . . had a chance to review some surveillance footage and we have a still image of a few individuals. Tell me do you recognize anyone in this photo?" Salimi immediately identified defendant as the shooter.

Salimi then picked defendant's photograph out of a six-person, blind-administered photo array. He was certain defendant was the shooter. Afterward, Fontoura re-entered the room and stated, "[a]nd just for the record, the male you

4

identified is known to the [ECPO] as Durrell Heard whose SBI number is 721168 Delta."

At the suppression hearing, Salimi testified that he identified defendant as the shooter in the surveillance still photo "[b]ecause I saw him, he was the shooter."  He denied identifying defendant in the still photo only based on the person having dreadlocks.  He stated that he was not instructed by anyone to identify defendant in the photo or to say he was the shooter.

Barkley was also asked to come to the ECPO to give a second recorded statement.  Once there, Fontoura and Ventola stated: "We asked you to come in here today because we wanted to show you a picture of a possible suspect and wanted to see if you can identify this person."  Ventola added, "if you recognize this person just let us know as the person who robbed you, victim of a robbery, and -- and/or the same person that -- responsible for the shooting.  So, this is a surveillance photo."

Barkley immediately stated he recognized both men in the photo.  He identified defendant as the person who shot Crenshaw and Trent as the one who robbed them.  Barkley testified at the suppression hearing that he did not know if the shooter would be in the still photo until the police showed it to him, and when they did, he identified defendant because he "saw his face as clear as day,"

A-4003-17T2

and stated "I know it's him because I know his face." Barkley confirmed he was sure defendant and Trent were the perpetrators of the crime, "[b]ecause I identified those faces." He denied that anyone directed him to identify the two men.

Barkley then picked defendant and Trent out of two separate photo arrays with two different detectives. He denied that anyone told him that the person he had picked out of the surveillance still would be in the photo array, or that he had picked the right people out of the photo arrays. When Fontoura came back into the room, he stated, "[f]or the record the male you identified is known to the [ECPO] as Durrell Heard whose [SBI] Number is 334741 Delta."

When Trent was later questioned, he admitted to being at the scene of the crime and identified himself and defendant on the surveillance still photo.

B.

Defendant moved to suppress Salimi's and Barkley's out-of-court identifications of him. The motion was denied in a well-reasoned written decision. The court stated:

> Here, the photo array procedure was not significantly suggestive by itself. It was not a show up identification. It was administered in a double[-]blind manner. The detectives who conducted the photo arrays did not know who the suspect was or if his photo was included in the array. The detectives provided adequate pre-

6

identification instructions to the witnesses. The photo arrays were comprised of six photos, five of which were of men who looked similar to [d]efendant. There was only one suspect, [d]efendant, included in each photo array. Detectives did not provide feedback on the witnesses' identifications.

Defendant focuses his argument on the fact that each witness was shown a surveillance still of [d]efendant and . . . Trent shortly before the photo array was done. This issue falls under the system variable of multiple viewings. The process of first showing the witnesses a still photo of [d]efendant makes it difficult to know whether the subsequent photo array identification was based on their memories of the original event or on the still photo they had just viewed. See [State v. Henderson, 208 N.J. 208, 255 (2011)]. This is particularly true given that the still photo and the photo arrays were shown to the witnesses close in time on the same day.

With regard to the identifications by . . . Salimi and . . . Barkley from the single surveillance camera still, it is true that [d]efendant met his burden of producing some evidence tied to a system variable that demonstrates that the identifications are suggestive. However, under the totality of the circumstances and through the application of the reliability factors, . . . Salimi and . . . Barkley's identifications are reliable.

In addressing the identification by . . . Salimi, the State did offer proof that the identification was reliable. As to the system variables, there is no evidence that the police told . . . Salimi that the shooter was in the still photograph and no evidence that the police told . . . Salimi that he had to identify someone. Defendant was not the only one in the photograph. Finally, there is no

evidence that the detectives provided feedback during or after the procedure.

As to the estimator variables and the reliability factors, . . . Salimi had ample opportunity to view [d]efendant at the time of the incident. . . . Salimi saw [d]efendant for sixteen seconds, which were not fleeting glimpses. The lighting was also abundant in the . . . restaurant and he was less than 20 feet away from the shooter. There were no obstructions between . . . Salimi and [d]efendant's face. Defendant also was not wearing a disguise.

Second, . . . Salimi was attentive during the shooting. There is no evidence that . . . Salimi was under any stress at the time of the incident. Furthermore, because the gun was not pointed at . . . Salimi nor could . . . Salimi see the gun from his position, . . . Salimi was not focused on the weapon.

Third, the evidence shows that . . . Salimi's prior description matches [d]efendant's physical appearance. Fourth, . . . Salimi's level of certainty when identifying [d]efendant is clearly satisfied in this case. There is no evidence that . . . Salimi hesitated in his identification.

Finally, only six days elapsed between the shooting and . . . Salimi's identification. It is unlikely that his memory of the incident would have significantly faded in six days. Thus, under the totality of the circumstances, . . . Salimi's identification was reliable.

In addressing the identification by . . . Barkley, once again, the State did offer proof that the identification was reliable. Similarly[] to the identification by . . . Salimi, there is no evidence that the police told . . . Barkley that the shooter was in the still photograph. The detectives informing . . . Barkley that they had a

8

possible suspect is not sufficient to demonstrate that the detectives significantly influenced . . . Barkley's identification. There was also no evidence that the police told . . . Salimi that he had to identify someone or that his identification was correct.

[B]arkley had ample opportunity to view [d]efendant at the time of the incident. . . . Barkley saw [d]efendant prior to the robbery, as he was waving the gun around while the robber was collecting the money, and during the shooting, which were not fleeting glimpses. As mentioned above, the lighting was also abundant in the . . . restaurant. There were no obstructions between . . . Barkley and [d]efendant's face . . . [d]efendant was not wearing a disguise.

Second, . . . Barkley was attentive during the shooting. . . . [T]here is no evidence that . . . Barkley was under any stress at the time of the incident. Furthermore, because the gun was not pointed at . . . Barkley, [he] was not focused on the weapon.

Third, the evidence shows, as it did for . . . Salimi's identification, that . . . Barkley's prior description matches [d]efendant's physical appearance.

Fourth, . . . Barkley's level of certainty when identifying [d]efendant as the shooter is clearly satisfied in this case. There is no evidence that . . . Barkley hesitated in his identification.

Finally, only six days elapsed between the shooting and . . . Barkley's identification. In comparison to . . . Salimi's memory, it is unlikely that his memory of the incident would have significantly faded in six days. Thus, under the totality of the circumstances, . . . Barkley's identification was reliable.

Therefore, because the out-of-court identifications of [d]efendant by . . . Salimi and . . . Barkley are reliable, they will not be suppressed, and the State may also elicit in-court identifications by these two witnesses as well.

C.

Defendant was tried before a jury in November and December 2017. Both Salimi and Barkley testified. In addition, the third robbery victim – Onque – was called as a witness. He stated that he was standing three feet from defendant at the time of the robbery and right next to Crenshaw when defendant shot Crenshaw. Onque stated that defendant entered the restaurant and said "this is a shake[,]" which Onque knew meant he was about to get robbed. When Onque was questioned by police in February 2015, he described the shooter as having dreadlocks, wearing a hoodie and jeans, and missing about four front teeth. At trial, defendant displayed his teeth for the jury, showing that he had missing or rotted top teeth. Onque testified that defendant accused Crenshaw of robbing Trent before shooting Crenshaw.

Onque's identification of defendant in a blind-administered photo array in February 2015 was not challenged. During the array, Onque stated he was "positive" defendant was the one who shot Crenshaw, because "I'll never forget that day."

Trent also testified, identifying himself as the lookout and defendant, his cousin, as the shooter. Trent told the jury that he and defendant planned to rob the restaurant. He also informed the jury that he had pled guilty earlier that year to conspiracy to commit robbery and robbery. The plea agreement required him to testify truthfully at defendant's trial. The State recommended a ten-year sentence with an eighty-five percent parole disqualifier.

D.

During the charge to the jury, the judge advised them that Trent was indicted for conspiracy to commit robbery, three counts of first-degree robbery, and felony murder. He further stated that Trent had pled guilty to conspiracy to commit robbery and first-degree robbery of Crenshaw. The judge then instructed: "Evidence of . . . Trent's plea of guilty may be used only to determine the credibility or believability of the witness' testimony."

The judge continued, stating:

> You may consider such evidence along with all the other factors that I mentioned previously in determining the credibility of the witness. However, you may not use . . . Trent's plea of guilty as evidence that this defendant is guilty of conspiracy to commit robbery or first-degree robbery for which defendant is charged."
>
> The law requires that the testimony of such a witness be given careful scrutiny. In weighing his testimony, therefore, you may consider whether he has a special

11

interest in the outcome of the case and whether his testimony was influenced by the hope or expectation of any favorable treatment or reward or by any feelings of revenge or reprisal. If you believe this witness to be credible and worthy of belief, you have a right to convict the defendant of conspiracy to commit robbery and first-degree robbery of Tykwan Crenshaw on . . . Trent's testimony alone, provided, of course, that upon a consideration of the whole case, you're satisfied . . . beyond a reasonable doubt of the defendant's guilt on those charges.

E.

Defendant was convicted on all charges. He was sentenced on March 5, 2018 to a fifty-five-year prison term for first-degree murder (count one), subject to N.J.S.A. 2C:43-7.2, the No Early Release Act (NERA). The court imposed fifteen-year prison terms for robbery (count four and five) and stated the sentences for count four and five would run concurrent to each other, but consecutive to count one. The remaining counts merged or were made solely concurrent. The Judgment of Conviction (JOC) entered that day also indicated that defendant's sentence on counts four and five was consecutive to the sentence on count one, but concurrent with each other and all unmerged charges. However, the judge listed the total custodial term as eighty-five years.

On March 12, 2018, the Department of Corrections (DOC) advised the sentencing court that the JOC reflected an eighty-five-year sentence, although

the aggregate term imposed by the sentences on each count only added to seventy years. The DOC asked the court for clarification. The court issued a letter and amended JOC. The letter stated "per [the] letter from DOC, dated 3/12/18 – counts [four and five] should run consecutive to count [one] [and] consecutive to each other."

## II.

On appeal, defendant presents the following arguments:

> I. DID THE COURT ERR IN DENYING A MOTION TO SUPPRESS IDENTIFICATIONS FROM TWO OUT-OF-COURT PHOTO ARRAYS?
>
> II. DID THE COURT ERRONEOUSLY INVITE THE JURY TO USE CO-DEFENDANT'S GUILTY PLEA AS SUBSTANTIVE EVIDENCE THAT DEFENDANT WAS GUILTY OF THE HOMICIDE AND WEAPONS OFFENSES?
>
> III. IS A REMAND FOR RESENTENCING REQUIRED?
>
> a. Was the Judgment of Conviction inconsistent with the court's oral sentence?
>
> b. Was the court's rationale for consecutive terms inconsistent with the verdict?
>
> c. Was defendant's refusal to speak at sentencing held against him as an aggravating factor?

13

A.

Defendant argues the trial court erred in denying his motion to suppress the out-of-court identifications made by Barkley and Salimi. In reviewing the denial of a motion to suppress an out-of-court identification, we must uphold the trial judge's factual findings so long as those findings are supported by sufficient credible evidence in the record. State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016). We owe particular deference to findings of fact that are based on "a trial judge's assessment of the credibility of a witness he has observed firsthand." Id. at 357.

Defendant contends the still photo of him taken from surveillance footage shown to Salimi and Barkley prior to the photo array irreparably tainted their identifications of defendant as the perpetrator of the homicide. In addition, defendant asserts the detective's statement made after the identification – "for the record" the person you identified was "known to the [ECPO] as Durrell Heard" – was improper feedback that tainted the identifications.

To challenge an out-of-court identification, "defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." State v. Henderson, 208 N.J. 208, 288 (2011). Once a hearing has been granted, the State must present proof that the identification

14

is reliable. Id. at 289. The State's burden to offer proof is the same as the burden of producing evidence described in N.J.R.E. 101(b)(2), which is sometimes referred to as the burden of going forward. State v. Henderson, 433 NJ. Super. 94, 107 (App. Div. 2013). "The burden of producing evidence has been described . . . 'as so light as to be little more than a formality.'" Ibid. (quoting State v. Segars, 172 N.J. 481, 494 (2002)). The evidence need not be persuasive, the State must merely "provide evidence on the issue that is germane to the inquiry with sufficient clarity so that the opposing party has a full and fair opportunity to respond." Ibid.

Although the State must present proof that the identification is reliable, it is defendant's ultimate burden "to prove a very substantial likelihood of irreparable misidentification." Ibid. Defendant may cross-examine the State's witnesses and present his own witnesses and relevant evidence related to system and estimator variables to meet this burden. Ibid. If, under the totality of the circumstances, defendant meets this burden, the court will suppress the out-of-court identification. Ibid. Although the Rules of Evidence apply in pre-trial evidentiary hearings, they may be relaxed "to admit relevant and trustworthy evidence in the interest of justice." R. 101(a)(3)(E).

A defendant's evidence of suggestiveness "must be tied to a system [variable] – and not an estimator – variable." Henderson, 208 N.J. at 288-89. System variables are "factors . . . within the control of the criminal justice system." Id. at 247. Examples of system variables include:

> 1. Blind Administration. Was the lineup procedure performed double-blind?
>
> . . . .
>
> 2. Pre-identification instructions. Did the administrator provide neutral, pre-identification instructions warning that the suspect may not be present in the lineup and that the witness should not feel compelled to make an identification?
>
> 3. Lineup Construction. Did the array or lineup contain only one suspect embedded among at least five innocent fillers? Did the suspect stand out from other members of the lineup?
>
> 4. Feedback. Did the witness receive any information or feedback, about the suspect or the crime, before, during, or after the identification procedure?
>
> 5. Recording Confidence. Did the administrator record the witness' statement of confidence immediately after the identification, before the possibility of any confirmatory feedback?
>
> 6. Multiple Viewings. Did the witness view the suspect more than once as part of multiple identification procedures? Did police use the same fillers more than once?

7. <u>Showups</u>.  Did the police perform a showup more than two hours after an event?  Did the police warn the witness that the suspect may not be the perpetrator and that the witness should not feel compelled to make an identification?

8. <u>Private Actors</u>.  Did law enforcement elicit from the eyewitness whether he or she had spoken with anyone about the identification and, if so, what was discussed?

9. <u>Other Identifications Made</u>.  Did the eyewitness initially make no choice or choose a different suspect or filler?

[<u>Id.</u> at 248-61, 289-90.]

Estimator variables are "factors related to the witness, the perpetrator, or the event itself . . . over which the legal system has no control."  <u>Id.</u> at 247. Estimator variables include: stress, weapon focus, duration, distance and lighting, witness characteristics, characteristics of the perpetrator, memory decay, race-bias, opportunity to view the criminal at the time of the crime, degree of attention, accuracy of prior description of the criminal, level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  <u>Id.</u> at 261-72, 291-92.

Here, the system variable at issue is "multiple viewings", as the ECPO detectives showed Salimi and Barkley the surveillance photo of defendant prior to the photo array.  "Viewing a suspect more than once during an investigation

can affect the reliability of the later identification." Id. at 255. "[S]uccessive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure." Ibid.

However, multiple viewings do not automatically warrant suppression of an out-of-court identification. To determine whether a multiple viewing identification should be suppressed, the question becomes "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." State v. Herrera, 187 N.J. 493, 503 (2006) (quoting Neil v. Biggers, 409 U.S. 188, 199 (1972)). A number of factors are considered in making this determination: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Henderson, 208 N.J. at 238. "These factors are to be weighed against 'the corrupting effect of the suggestive identification itself.'" Ibid. (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)).

Defendant argues that Salimi's identification is tainted because Fontoura asked Salimi to assist in identifying those responsible for the "shooting homicide" that Salimi had witnessed. In addition, Fontoura told Salimi he had found a "still image" of "surveillance footage." Defendant contends that these statements signaled to Salimi that the suspects were in the photo.

Defendant's arguments are not supported by the record. The following exchange takes place in Salimi's recorded statement:

> [FONTOURA]: [M]y partner . . . had a chance to review some surveillance footage and we have a still image of a few individuals. Tell me do you recognize anyone in this photo?
>
> [SALIMI]: This one.
>
> [FONTOURA]: This guy here with the dreadlocks?
>
> [SALIMI]: Yes.
>
> [FONTOURA]: Okay. And this is the individual you described to me the night of the shooting?
>
> [SALIMI]: Yeah.
>
> [FONTOURA]: Okay. And this is the individual you saw do what?
>
> [SALIMI]: Shooting the guy.

Fontoura did not tell Salimi he had to choose an individual in the still photo, nor did he state that the perpetrators were in the photo, or that Salimi's

identification was correct. Salimi testified during the suppression hearing that he identified defendant in the surveillance photo "[b]ecause I saw him, he was the shooter." He also testified that he did not pick defendant out solely because of his dreadlocks.

Defendant's challenge to the photo array procedure also lacks merit. He contends that the photo array, which included defendant's photograph, conveyed police approval of Salimi's identification of defendant in the still photo. However, after Salimi identified defendant in the surveillance photo, Fontoura excused himself from the room and another detective came in and conducted the photo array. The detective instructed, in pertinent part:

> In a moment I will show a number of photographs one at a time. You may take as much time as you need to look at each of them. You should not conclude that the person who committed the crime is in the group merely because a group of photographs are being shown to you.
>
> The person who committed the crime may or may not be in the group. And mere[] display of the photograph is . . . not meant to suggest that the police believe that the person who committed the crime is in the photographs.
>
> You do not have to select any photograph. If you don't understand anything that I'm telling you stop me. . . . There is no significance in the order in which the photographs are displayed. Even if you select a photograph all of the photographs will be shown to you.

20

Tell me immediately if you recognize anyone in the photographs.

. . . .

If you do select a photograph please don't ask me whether I agree or disagree to support your selection. I do not know whom the suspect [is], if he or she is in the lineup, or what photograph he or she may be present in. It is your choice alone that counts. Please do not discuss whether or not you selected a photograph with any other witness.

Salimi was shown six photos; he identified defendant in the third one. The inclusion of defendant's photograph in the photo array does not demonstrate that the detectives conveyed to Salimi their approval of his identification of the still photo. There is no logic to defendant's assertion that the detectives should not have included his photograph in the photo array; there would be little to no value to the photo array if it were exclusively conducted with photographs of non-suspects. Moreover, when questioned about the identification at trial, Salimi testified that he did not pick defendant out of the lineup because of the still photo. He stated he selected him because he saw defendant shoot Crenshaw inside his restaurant.

Defendant also asserts that the statement "just for the record, the male you identified is known to the [ECPO] as Durrell Heard whose SBI number is 721168 Delta," was impermissible feedback, telegraphing to Salimi that

21

defendant was a bad actor. This statement was made after the identification and defendant has not established that Salimi found this statement to be anything more than a recitation of defendant's name.

Defendant reiterates his arguments with regard to Barkley's out-of-court identification. We equally find them without merit. On January 16, 2015, after Barkley gave detectives a second statement, he was asked to review a still photograph from surveillance footage of the restaurant area:

> [VENTOLA]: Okay. And I remember . . . speaking to you the day it happened. . . . [T]hroughout the investigation we were able to obtain some surveillance photos. One of them on Springfield Avenue and we wanted to bring it to your attention and show it to you and then we also wanted to bring another detective in just to show you a few pictures . . . is that okay?
>
> [BARKLEY]: Yeah.
>
> [VENTOLA]: I just want to bring your attention to a photo. And please if you recognize this person just let us know as the person who robbed you, victim of a robbery, . . . and/or the same person . . . responsible for the shooting. So, this is a surveillance photo. Do you recognize anyone? Who do you recognize?
>
> [BARKLEY]: Both of them.
>
> [VENTOLA]: You recognize both . . . [o]kay. Are these the individuals you described to me the night of the incident? Okay. And which one of these two individuals actually was the one that robbed you?

Okay. He robbed you. And which one actually shot? And he's the one who shot?

[BARKLEY]: Uh-huh.

. . . .

[VENTOLA]: We're going to step out. We're going to have another detective come in. He's going to show you a couple photographs. And just see if you recognize anyone in the photographs as either of these two males.

Another detective then came into the room to conduct the photo array. He gave Barkley the same instructions previously given to Salimi. Barkley stated that he understood them.

As he reviewed the photographs, Barkley recognized defendant in the fourth one. He told the detective that the man in photograph number four was the shooter. As with Salimi, Fontoura re-entered the room and told Barkley the man he picked from the photo array was "known to the [ECPO] as Durrell Heard whose [SBI] Number is 334741 Delta."

We reject defendant's arguments regarding the photo array for the reasons stated above. During the suppression hearing, Barkley stated that he did not know if the shooter would be in the still photo until the police showed it to him. When they did, he could identify defendant because he "saw his face as clear as day." He stated, "I know it's him because I know his face." In addition,

23

defendant's long dreadlocks in the photo also matched Barkley's description of the shooter. There is no evidence that Barkley was given any guidance to help him identify the shooter.

When Barkley was asked about Fontoura's statement at the end of the process, he said "They didn't – they didn't say if I was right or wrong. They said okay. And they took the pictures away." Barkley also testified that police did not tell him that the person he saw in the still photo would be in the photo array.

The descriptions Salimi and Barkley gave police immediately after the incident matched defendant's appearance on the surveillance photo. Barkley stated defendant was wearing a vest and long dreads, walking with another, chubbier man who was wearing all black and a black do-rag. Salimi's initial statement was even more specific: the shooter was wearing a black vest over a white sweater. The only person on the surveillance video at the time of the shooting wearing a black vest over a white shirt was defendant.

The surveillance video was taken from the area outside the restaurant minutes before the crime occurred, and depicts people fleeing the scene moments after it occurred. Defendant does not dispute that the footage and still photograph made from it shows him and Trent. And, both witnesses stated that they identified defendant in the still photo and again in the photo array because

they recognized him as the man they saw in the restaurant robbing the customers and shooting Crenshaw.

In addition, the witnesses' testimony was corroborated by certain physical evidence. Salimi recalled a second shot hitting the doorframe, and indeed, a bullet was discovered in the doorframe. Barkley stated the gun was a .38 revolver. The bullets recovered at the crime scene belonged to a .38 revolver.

The trial judge found Fontoura, Salimi, and Barkley credible. According that finding and the deference it is owed, we are satisfied defendant has not demonstrated "a very substantial likelihood of irreparable misidentification" requiring the suppression of the out-of-court identifications. See Henderson, 208 N.J. at 289 (holding that a court should suppress the identification only if it "finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification."). The presence of a single, potentially suggestive factor does not defeat an eyewitness identification. See State v. Adams, 194 N.J. 186, 203-206 (2008) (based on the totality of the circumstances, there was sufficient evidence in the record for the trial court to conclude that, despite the clear suggestive nature of the identification procedures, the identifications were reliable and did not result in a substantial likelihood of misidentification).

A-4003-17T2

B.

Defendant argues for the first time that the court erred in giving the following instruction to the jury regarding co-defendant Trent: "[Y]ou may not use [Leon] Trent's [guilty plea] as evidence that this defendant is guilty of conspiracy to commit robbery or first-degree robbery for which defendant is charged." Defendant contends this instruction was "grossly prejudicial" because the model jury charge is more general and precludes jurors from using a co-defendant's guilty plea as "evidence that this defendant is guilty of the crimes that he/she is charged with." See Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006). He asserts that this charge gave the jury implicit permission to use Trent's guilty plea as evidence that defendant was guilty of all the other offenses he was charged with.

Defense counsel did not object to this jury instruction. Therefore, we review for plain error. See R. 1:7-2; State v. Wakefield, 190 N.J. 397, 473 (2007) ("[T]he failure to object to a jury instruction requires review under the plain error standard."). Where there is a failure to object, a reviewing court presumes the instruction was "not error" and "unlikely to prejudice defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012).

It cannot be disputed that "[c]orrect charges are essential for a fair trial." State v. Martin, 119 N.J. 2, 15 (1990). "[T]he court must explain the controlling legal principles and the questions the jury is to decide." Ibid. We "evaluate any alleged error in a portion of a jury charge in the context of the entire charge." State v. Marshall, 173 N.J. 343, 355 (2002).

To sustain a showing of plain error, a defendant must demonstrate "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Nero, 195 N.J. 397, 407 (2008). Defendant has not met his burden here where four eyewitnesses identified defendant as the perpetrator of the charged crimes. He was seen at the scene of the crime participating in the robberies of Onque and Barkley and shooting Crenshaw.

Moreover, the judge gave the jury limiting instructions that Trent's guilty plea could only be used to assess his credibility, and that his plea to robbery and conspiracy to commit robbery could not be used as evidence against defendant for the same charges. In addition, defense counsel conducted an extensive cross-examination of Trent, highlighting his inconsistent statements to police, and arguing to the jury during his summation that Trent was lying to "save himself."

In light of the overwhelming evidence against defendant, we cannot discern that the limiting instruction regarding Trent effected any change in the case's outcome.

C.

Defendant also challenges his sentence, contending the amended JOC is inconsistent with the court's oral pronouncement of his sentence. We agree that the trial judge was inconsistent at times during the sentencing hearing regarding the concurrent or consecutive nature of counts four and five. And the initial JOC listed counts four and five as running concurrent to each other. However, a reading of the sentencing transcript in conjunction with the JOCs as well as the judge's clarification reflects the clear intention of the court was for the fifteen-year sentences on counts four and five to run consecutively to each other and to the fifty-five-year sentence imposed on count one.

We support our conclusion with the following evidence. After explaining the various sentences, the judge stated: "Your earliest eligibility for release on parole based on the published parole eligibility tables will be [seventy-two] years, three months, and nine days." This calculation is 85% of an eighty-five-year sentence. In addition, each of the JOCs lists an aggregate prison term of eighty-five years. Finally, when the judge was asked to clarify his intent

28

regarding counts four and five, he amended the JOC to indicate counts four and five were to run consecutive to each other as well as to count one.

"[S]entences can be upheld where the sentencing transcript makes it possible to readily deduce the judge's reasoning." State v. Miller, 205 N.J. 109, 129 (2011).  A court can "safely discern the sentencing court's reasoning when the record is clear enough to avoid doubt as to the facts and principles the court considered and how it meant to apply them." Id. at 130.

Here, the sentencing transcript and the court's clarification make the judge's intended sentence easy to "readily deduce."  The judge intended to sentence defendant to an aggregate eighty-five-year term; fifty-five years on count one, fifteen years on count four, and fifteen years on count five, all running consecutively.

We discern no merit in defendant's argument that the court's sentence was inconsistent with the jury's verdict.  The judge carefully considered each Yarbough[2] factor and placed his extensive findings on the record.  Because he found the murder of Crenshaw took place to facilitate the robbery of him, he ran the sentence on count one concurrent to count three, but consecutive to counts

---

[2]  State v. Yarbough, 100 N.J. 627, 643-44 (1985).

A-4003-17T2

four and five, as the murder was a separate act from the robbery of the other victims.

The jury convicted defendant on all counts, therefore finding that defendant killed Crenshaw with a separate, purposeful criminal intent apart from the other charged offenses. We are satisfied that the imposition of a consecutive sentence is supported by the credible evidence in the record.

Any remaining arguments not considered lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4003-17T2