**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0314-18T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

YANG BIN, a/k/a WANG BIN,
WANG PING, BIN YANG,
CHEN BIN, SUN BIN, YI CAO,
YU CHEN, HUBI CHEN,
YI CHO, CAO GU, WU YI, and
CHEN MING,

     Defendant-Appellant.

_____

Argued October 13, 2020 – Decided December 8, 2020

Before Judges Sabatino and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 17-08-1735.

Douglas R. Helman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Douglas R. Helman, of counsel and on the brief).

Catlin A. Davis, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Catlin A. Davis, of counsel and on the brief).

PER CURIAM

Following a three-day jury trial, defendant was convicted of third-degree computer theft, N.J.S.A. 2C:20-25(c); and third-degree theft by unlawful taking, N.J.S.A. 2C:20-3. The convictions stemmed from defendant stealing $550 of free slot play from the player card of a member of the Tropicana Casino's rewards program, and then using the stolen free play to win $750 at the casino. The trial proofs included video surveillance footage depicting the events, and defendant's unrecorded statement to police while in custody admitting that he paid another individual money for access to the card. Defendant was sentenced to an extended term of seven years' imprisonment and ordered to pay $1300 in restitution.

Defendant now appeals from his convictions and sentence, raising the following arguments for our consideration:

> POINT I
>
> THE TRIAL JUDGE ERRED IN CONCLUDING THAT MIRANDA[1] DID NOT APPLY TO THIS CASE. OFFICER WHEELER PROMPTED

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[DEFENDANT] TO GIVE A FORMAL STATEMENT WHILE IN A HOLDING CELL, GOING BEYOND A ROUTINE BOOKING INQUIRY AND SUBJECTING [DEFENDANT] TO A CUSTODIAL INTERROGATION, AND THE STATE CANNOT PROVE [DEFENDANT] KNOWINGLY WAIVED HIS RIGHTS DUE TO HIS LOW ENGLISH PROFICIENCY. SUPPRESSION IS REQUIRED.

POINT II

ALLOWING THREE WITNESSES TO TESTIFY TO THE CONTENTS OF THE SURVEILLANCE VIDEOS, AND MAKE IDENTIFICATIONS OF INDIVIDUALS PRESENT IN THE COURTROOM WITHOUT ANY FOUNDATION, VIOLATED [DEFENDANT'S] RIGHT TO A FAIR TRIAL, NECESSITATING REVERSAL.

POINT III

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO INSTRUCT THE JURY ON HOW TO EVALUATE [DEFENDANT'S] INCULPATORY OUT-OF-COURT STATEMENT. (Not Raised Below).

POINT IV

A REMAND FOR RESENTENCING IS REQUIRED FOR RECONSIDERATION OF THE ORDER OF RESTITUTION.

Having considered the arguments and applicable law in light of the record, we affirm the convictions, but remand the matter for a restitution hearing.

The following pertinent facts were presented to the jury. On January 28, 2017, Joseph Fazzia went to the Tropicana Casino to gamble. Based on his frequent gambling visits to the casino, Fazzia was a member of Tropicana's rewards program and was given a black player card with a unique identification number, 1960962. Fazzia's black card allowed him to earn rewards, including "free slot play," which was the equivalent of "slot cash." Prior to arriving at the Tropicana, Fazzia had arranged for a Tropicana marketing executive, Mary Lou Spatolla, to download his earned free slot play into his account. However, when he arrived at the casino and attempted to use his slot cash, his card had a zero balance.[2] Once he reported the issue to Spatolla, she reloaded his card with the missing free slot play and began investigating its disappearance.

Upon reviewing the casino's rewards redemption records for Fazzia's account, Spatolla learned that Fazzia's free slot play had been redeemed earlier that evening. According to the records, $500 of free slot play had been redeemed at 7:41 p.m., and an additional $50 of free slot play had been redeemed at 7:43 p.m. Both redemptions had occurred at slot machine number 5333 at location

---

[2] Fazzia explained that although his black card could only be accessed by entering a "pin number" that he had created, "somebody standing behind [him]" could observe the number without his knowledge.

B-0908 on the casino floor. Spatolla reported the suspicious activity to Alexis Gonzalez, a security supervisor at Tropicana, who commenced an investigation of slot machine 5333, beginning with obtaining the records for the machine.

The records for machine 5333 showed that Fazzia's black card had been inserted into the machine on two separate occasions on January 28, each time downloading his free slot play into the machine. On both occasions, immediately after the free slot play was downloaded, Fazzia's card was removed and a gold player card with identification number 3484253, registered to a player by the name of Bing Hua Lu, was inserted into the machine. Lu's card was then used to change the machine's settings and play the game, which ultimately lead to the printing of two winning vouchers, the first at 7:43 p.m. for $500, and the second at 7:44 p.m. for $250.

On February 1, 2017, after reviewing the machine records, Gonzalez requested the January 28 video surveillance footage from 7:09 p.m. to 7:50 p.m. for machine 5333 from Jeremy Edwards, a supervisor in Tropicana's surveillance department. Upon receipt, Gonzalez watched the video at approximately 4:00 p.m. on February 2, 2017, and identified the man using machine 5333 at the time in question as defendant. Immediately after viewing

the video, Gonzalez located defendant in the casino, escorted him to the casino security offices, and called the New Jersey State Police.

State Police Detective Jonathan Wheeler responded to the Tropicana and arrested defendant after Gonzalez informed Wheeler of his investigation and provided him with the documents he had collected. Wheeler transported defendant to the State Police headquarters in Atlantic City, placed him in a holding cell, and advised him of his Miranda rights. Although defendant "did not want to provide a formal statement[,]" when Wheeler informed defendant that he was going to be "charged with . . . some type of theft," defendant spontaneously responded that he did not "know why [he was] being charged," because he had "paid another Asian male $250 to access that account." Defendant explained that "he never held the . . . card." Instead, "when he played[,] . . . the Asian male would come up to him and put the . . . card in the machine, put in the account PIN . . . and then he would have access to their promotional play."

At trial, in addition to Fazzia, Spatolla, Gonzalez, Edwards, and Wheeler testifying for the State about their involvement in the incident, Tropicana Slot Operations Director, Robert Stewart, matched up the casino computer records with machine 5333's operations and confirmed that the records reflected what

was depicted in the video surveillance footage. Defendant elected not to testify[3] but, through cross-examination and summations, advanced the theory that the State could not prove he acted knowingly or purposely, the requisite mental states for commission of the offenses.

After the State rested, defendant moved for a judgment of acquittal, Rule 3:18-1, which was denied by the trial judge. Following the jury verdict, defendant moved for a new trial, Rule 3:20-1, arguing he was deprived of "a fair trial[,]" primarily due to the admission of his statement at trial in violation of Miranda, and the improper denial of his earlier Reyes[4] motion for judgment of acquittal. On August 10, 2018, the judge denied defendant's motion but granted the State's motion to sentence defendant to a discretionary extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). The judge then merged the theft by unlawful taking count into the computer theft count and imposed a flat

---

[3] Defendant was assisted by an interpreter throughout the trial.
[4] State v. Reyes, 50 N.J. 454 (1967).

A-0314-18T4

seven-year term of imprisonment.[5]  A memorializing judgment of conviction (JOC) was entered on August 24, 2018,[6] and this appeal followed.

## II.

In Point I, defendant argues the judge erred in finding that "Miranda's protections did not apply, but even if they did, that [defendant's] statement was voluntary."  We disagree.

At the May 31, 2018 Miranda hearing, Detectives Jonathan Wheeler and Michael Nelson, both twelve-year veterans of the New Jersey State Police, testified for the State.  According to Wheeler, after responding to the casino, he arrested and transported defendant to State Police headquarters, arriving at approximately 7:30 p.m., and "placed defendant in a holding cell" that did not

---

[5]  A concurrent three-year term was also imposed on an unrelated accusation.

[6]  We point out that contrary to the judge's oral sentence, the JOC mistakenly indicates that concurrent sentences were imposed on the two theft counts. However, "where there is a conflict between the oral sentence and the written commitment, the former will control if clearly stated and adequately shown[.]" State v. Pohlabel, 40 N.J. Super. 416, 423 (App. Div. 1956).  During the remand, "[t]his discrepancy should be corrected by the trial court and an appropriate amendatory judgment entered."  State v. Rivers, 252 N.J. Super. 142, 147 n.1 (App. Div. 1991).

have recording capability.[7]  Assisted by Nelson, Wheeler immediately began reading defendant his rights verbatim from a standard <u>Miranda</u> card.[8]

Both detectives testified defendant was alert and appeared to understand what was read, nodding his head "up and down" to indicate he understood his rights.  According to the detectives, defendant never spoke any language other than English, and never stated or physically gestured that he did not understand what was being said.  While Wheeler acknowledged on cross-examination that defendant spoke with "[s]omewhat of an accent," and that his first language did not appear to be English, Nelson testified that defendant's first language "never really . . . came up . . . because the whole conversation was in English." Although neither detective offered defendant an interpreter, they testified defendant never requested an interpreter or an attorney.  Nelson stated he did not believe defendant needed an interpreter because "[he] understood everything."

---

[7]  Subject to specified exceptions, <u>Rule</u> 3:17 requires law enforcement officers to record custodial interrogations of those who are suspected of committing crimes enumerated in subsection (a), which does not include theft offenses.

[8]  The <u>Miranda</u> card was admitted into evidence at the hearing.

After administering the <u>Miranda</u> rights, the detectives began the booking process. Wheeler asked defendant if he wanted "to provide a formal statement[,]" to which defendant responded he did not. According to Wheeler, had defendant agreed to give a formal statement, he would have been "walked across the hall to [an] interview room" equipped with recording capability, and re-administered his <u>Miranda</u> rights. Continuing the booking interview, the detectives informed defendant he was going to be charged with some type of theft. At that point, defendant exclaimed that "he didn't understand why he was being arrested since he paid another individual [$250] for access to the card." The detectives did not respond to defendant's statement, nor did they ask any follow-up questions "related to the theft." Nelson testified defendant's statement did not "immediately" follow defendant's refusal "to give a formal taped statement[,]" and both detectives testified defendant was never coerced or threatened in any way and was never promised anything to provide a statement.

Next, as part of the booking process, Wheeler and Nelson began collecting "biographical information" from defendant, including his "[n]ame, date of birth, current address, [and] telephone number." Defendant appeared to understand the questions and provided responsive answers. At approximately 9:00 p.m., defendant was fingerprinted and returned to the holding cell. Upon "running his

10

criminal history," the detectives discovered that defendant, who was then fifty years old, had fourteen prior arrests with "nine felony convictions." The criminal history check also revealed "an immigration and a customs enforcement issue that had to be addressed."

Both detectives testified that defendant's release was delayed because they had to determine the appropriate charges, review other investigation reports, and contact Immigration and Customs Enforcement (ICE) officials to ascertain whether there was a federal detainer or warrant for defendant. At approximately 11:24 p.m., when defendant was about to be released, Wheeler realized defendant had not signed the Miranda card, which defendant then signed without hesitation or objection, acknowledging that he had been "read his rights earlier in the evening." Wheeler acknowledged that he had neglected to have defendant sign the Miranda card immediately after being advised of his rights.[9]

Following the hearing, on June 1, 2018, the judge found no Miranda violation and entered an order granting the State's motion to admit defendant's statement at trial. In an accompanying letter opinion, the judge found both detectives to be "very credible witnesses[,]" who provided "clear and direct"

---

[9] Wheeler explained he did not want to interrupt the investigation by removing defendant from the holding cell so that he could sign the card.

answers on direct and cross-examination, "had an appropriate demeanor," and were "consistent in their testimonies." As a result, the judge made detailed factual findings in accordance with their testimony.

Applying the governing principles to his factual findings, the judge "agree[d] with the State" that when defendant made his statement, he "was not subject to interrogation," as required under "the second prong of Miranda." Instead,

> [t]hrough his own volition, while the detective was obtaining biographical information, . . . [d]efendant made his statement. It was not prompted no[r elicited] by the detectives in any way whatsoever. Although . . . [d]efendant did not give a formal statement as to his role in the ongoing investigation, he did proffer the fact that he paid "an unknown Asian man" $250 in order to gain access to another patron's account, which had $550 worth of promotional dollars available.

The judge determined further that even if Miranda applied, "the rights were given to . . . [d]efendant and clearly waived." In that regard, the judge explained:

> [F]irst[,] . . . there is no doubt that . . . [d]efendant waived his rights intelligently . . . . Defendant, at the time, was of sound age and did not have a known mental defect that would leave the impression that he was not able to understand what his Miranda rights were. Throughout the entire evening, . . . [d]efendant never requested an interpreter no[r] did he give any indication that he was unable to understand the detectives. In fact,

12

he provided appropriate oral responses to the basic questions and also gave appropriate physical gestures in response to some questions such as nodding his head affirmatively. Second, the [c]ourt finds that . . . [d]efendant signed a <u>Miranda</u> card . . . . The [c]ourt recognizes [by] the admissions of the two witnesses that the card was not si[gned] until several hours after the oral warnings were given and after he made the unsolicited statement to the detectives. Nonetheless, by signing said card at any time, . . . [d]efendant acknowledged he received the warnings and understood them. Further, the [c]ourt notes that . . . [d]efendant has an extensive arrest and conviction history and is thus familiar with the criminal justice system process and the <u>Miranda</u> warnings. Lastly, . . . . there is nothing that shows . . . [d]efendant was forced or coerced to sign his <u>Miranda</u> rights or make a voluntary statement [by] the detectives.

In reviewing a trial court's decision to admit or exclude a defendant's statement following a testimonial hearing, we "must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record" and "disregard those findings" only when they "are clearly mistaken." <u>State v. Hubbard</u>, 222 N.J. 249, 262 (2015). "We defer to those findings of fact because they 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" <u>Ibid.</u> (quoting <u>State v. Johnson</u>, 42 N.J. 146, 161 (1964)). "A trial court's interpretation of the law, however, and the consequences that flow from established facts are not entitled to special deference." <u>Id.</u> at 263

13

(citing State v. Gandhi, 201 N.J. 161, 176 (2010)). Thus, "[a] trial court's legal conclusions are reviewed de novo." Ibid.

Turning to the substantive Miranda principles governing this appeal, "[t]he United States Supreme Court has made clear that Miranda warnings are required 'whenever a person in custody is subjected to either express questioning or its functional equivalent.'" State v. Wright, 444 N.J. Super. 347, 363-64 (App. Div. 2016) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). See also State v. Bey, 112 N.J. 45, 68 n.13 (1988) (adopting the Innis "functional equivalent" of interrogation rule in New Jersey). In Innis, the Supreme Court

> explained that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [whether inculpatory or exculpatory] from the suspect."
>
> [Wright, 444 N.J. Super. at 364 (alteration in original) (quoting Innis, 446 U.S. at 301) (footnotes omitted).]

"The latter portion of the definition focuses primarily on the perceptions of the suspect, rather than the intent of the police." State v. Mallozzi, 246 N.J. Super. 509, 515 (App. Div. 1991) (citing Innis, 446 U.S. at 301). "In order to constitute interrogation, police conduct 'must reflect a measure of compulsion above and beyond that inherent in the custody itself.'" Ibid. (quoting Innis, 446

14

U.S. at 300). "Thus, booking procedures and the routine questions associated therewith are ministerial in nature and beyond the right to remain silent." Ibid. Indeed, merely informing an in-custody defendant "why he was being detained" does not trigger an interrogation. Wright, 444 N.J. Super. at 366. "Moreover, unexpected incriminating statements made by in-custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible." Mallozzi, 246 N.J. Super. at 515-16.

On the other hand, "[t]he initiation of a general discussion about the victim clearly satisfies [the Innis] standard[,]" as does "generalized discussion relating to [the] investigation . . . ." Bey, 112 N.J. at 68 n.13 (citations omitted). Similarly, asking an in-custody defendant "why he refused to talk was 'reasonably likely to elicit an incriminating response[.]'" Anderson v. Smith, 751 F.2d 96, 105 (2d Cir. 1984) (quoting Innis, 446 U.S. at 301). "[W]hen a defendant challenges a statement procured by a law enforcement officer without the benefit of Miranda warnings[,]" the State bears the heavy burden of proving "beyond a reasonable doubt" that the statement is admissible. Hubbard, 222 N.J. at 267.

Applying these principles, we are satisfied the judge's determination that defendant's statement was not subject to questioning nor the functional

equivalent of questioning within <u>Miranda</u>'s strictures, as defined by <u>Innis</u>, is legally sound and supported by the record. As the judge found, the detectives asking defendant routine questions associated with the booking process and informing defendant of the charges against him were not designed or done to elicit any type of incriminating or substantive response from defendant. Contrary to defendant's contention, the detectives were merely conducting the routine booking inquiry and providing defendant information to which he was otherwise entitled.

Defendant contends that Wheeler asking defendant whether he wanted to give a statement was reasonably likely to elicit an incriminating response. Our rejection of this contention is supported by the fact that defendant responded to Wheeler's question by declining the offer. It was only after the detectives continued the booking interview and informed defendant that he was being charged with theft that defendant blurted out the statement. In any event, asking defendant if he would like to give a statement, which calls for a yes-or-no answer, is a far cry from asking a defendant "why he refused to talk" as occurred in <u>Anderson</u>, 751 F.2d at 105, where the court determined that the open-ended question exceeded the bounds of routine booking questions and violated

16 <span>A-0314-18T4</span>

defendant's <u>Miranda</u> rights. Here, Wheeler's question fell outside the <u>Innis</u> definition of interrogation.

For the sake of completeness, we also agree with the judge's determination that even if <u>Miranda</u> applied, the statement was properly admitted as the product of a voluntary waiver. "A confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights[,]" and provided a "'voluntary, knowing and intelligent'" waiver of "any or all of those rights[.]" <u>Hubbard</u>, 222 N.J. at 265 (quoting <u>State v. Hreha</u>, 217 N.J. 368, 382 (2014)). "New Jersey law requires that the prosecution 'prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances.'" <u>State v. A.M.</u>, 237 N.J. 384, 397 (2019) (quoting <u>State v. Presha</u>, 163 N.J. 304, 313 (2000)). "Furthermore, the State bears the burden of proving beyond a reasonable doubt that a defendant's confession is voluntary and not resultant from actions by law enforcement officers that overbore the will of a defendant." <u>Hubbard</u>, 222 N.J. at 267.

"A waiver may be 'established even absent formal or express statements[,]'" <u>A.M.</u>, 237 N.J. at 397 (quoting <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 383 (2010)), as "[a]ny clear manifestation of a desire to waive is sufficient."

State v. Kremens, 52 N.J. 303, 311 (1968). "[A] valid waiver does not require that an individual be informed of all information useful in making his decision." A.M., 237 N.J. at 398 (quoting State v. Nyhammer, 197 N.J. 383, 407 (2009)). "Instead, a knowing, intelligent, and voluntary waiver is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court." Ibid. "In the totality-of-the-circumstances inquiry, courts generally rely on factors such as 'the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Ibid. (quoting State v. Miller, 76 N.J. 392, 402 (1978)). "Moreover, courts applying the totality-of-the-circumstances test should look to whether the defendant has had previous encounters with law enforcement and the period of time between when Miranda rights were administered and when defendant confessed." Hreha, 217 N.J. at 383.

Here, defendant claims the State failed to meet "its heavy burden in proving [defendant] knowingly waived his rights" because "his English proficiency is low, the officers knew that, and yet they never asked [defendant] if he would like an interpreter." In A.M., our Supreme Court considered whether

a defendant, "who [spoke] limited English, waived his constitutional right against self-incrimination" pursuant to <u>Miranda</u>. 237 N.J. at 389. There, "[b]efore his interrogation, [the] defendant reviewed a Spanish-language <u>Miranda</u> form while a Spanish-speaking officer read aloud defendant's rights[,]" and then signed it after "[t]he officer pointed out the waiver portion of the form . . . ." <u>Ibid.</u> "Afterward, [the] defendant made incriminating statements in response to police officers' questions." <u>Ibid.</u>

Noting that "the better practice would have been to read aloud the form's waiver portion to [the] defendant," the Court concluded the trial court's decision that the defendant understood his rights and voluntarily waived them was adequately supported by the record. <u>Ibid.</u> The Court considered the totality of the circumstances, including the defendant's "request to have a Spanish translator present," which was provided, as well as the absence of any indication that the defendant "was confused[,]" "did not fully appreciate his rights," or was "'coerced, intimidated, or tricked' by police into giving a statement." <u>Id.</u> at 399 (citation omitted).

Likewise, here, after assessing the totality of the circumstances, the judge determined defendant's waiver was valid, a determination that is supported by the record. Those circumstances included the fact that the entire exchange was

in English, as well as the fact that defendant never requested an interpreter nor gave any indication he was unable to understand the detectives. Instead, defendant gave appropriate verbal and physical responses to the detectives' questions, had an extensive prior criminal history that presumably familiarized him with the criminal justice system, and ultimately signed the Miranda card acknowledging that he had been advised of and understood his rights. Contrary to defendant's contention, there was no requirement that the detectives ask defendant whether "he [spoke] English fluently" or wanted "an interpreter" because neither detective was unsure of defendant's English proficiency. Moreover, we do not interpret A.M. as requiring such questioning in the circumstances of this case.

III.

In Point II, defendant argues he was deprived of "due process" and "a fair trial" because three State witnesses provided impermissible opinion testimony when they narrated video surveillance from the Tropicana and improperly identified defendant "based only on the video itself." Specifically, according to defendant, "Edwards made an inverse identification of the person on the video as 'not Joseph Fazzia,' . . . Gonzalez identified [defendant] as the person in the video, and pointed him out in court[,]" and Wheeler "ma[d]e an implicit

20

identification" of defendant "while the video was being played." Defendant asserts "[n]one of the witnesses directly observed what was depicted in the video, and thus the narration 'usurp[ed] the jury's function' by offering 'a lay opinion on a matter . . . as to which the jury is as competent . . . to form a conclusion.'" Defendant continues that the purported errors were compounded by the judge's failure to instruct "the jury how to evaluate the identifications."

We review a trial court's evidentiary determinations under an abuse-of-discretion standard. State v. Perry, 225 N.J. 222, 233 (2016). An abuse of discretion occurs when a trial court's evidentiary ruling "was so wide of the mark" as to result in "a manifest denial of justice" and the evidence diverts the jurors from a reasonable and fair evaluation of guilt or innocence. State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

Turning to the substantive principles governing lay opinion testimony,

> [l]ay witnesses may present relevant opinion testimony in accordance with Rule 701, which permits 'testimony in the form of opinions or inferences . . . if it . . . is rationally based' on the witness'[s] "perception" and "will assist in understanding the witness'[s] testimony or in determining a fact in issue."
>
> [State v. Lazo, 209 N.J. 9, 22 (2012) (second and third alterations in original) (quoting N.J.R.E. 701).]

21

"The Rule does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as [the witness] to form a conclusion[.]'" State v. McLean, 205 N.J. 438, 459 (2011) (alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). "[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460.

In Lazo, our Supreme Court held a detective's testimony explaining why he included the defendant's picture in a photo array was inadmissible because the decision was based on the defendant's "similarities to the victim's description[,]" not the detective's personal knowledge. 209 N.J. at 19, 21-22. "In essence, the detective told the jury that he believed defendant closely resembled the culprit—even though the detective had no personal knowledge of that critical, disputed factual question." Id. at 22. By doing so, the detective improperly bolstered the victim's identification and usurped the jury's responsibility to weigh the victim's credibility. Id. at 13, 22.

The Lazo Court reasoned:

> Despite a lack of personal knowledge, the detective conveyed his approval of the victim's identification by relaying that he, a law enforcement officer, thought [the] defendant looked like the culprit as well. In an

identification case, it is for the jury to decide whether an eyewitness credibly identified the defendant. Guided by appropriate instructions from the trial judge, juries determine how much weight to give an eyewitness' account. Neither a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province.

[Id. at 24 (citation omitted).]

In Lazo, the Court distinguished situations in which a law enforcement official offered a lay opinion identifying a defendant from a surveillance photo as stand-alone testimony. Id. at 22-23. In that regard, the Court favorably cited cases where such lay opinion identification was allowed in the federal system when no other identification testimony was available. Ibid. For example, in United States v. Beck, 418 F. 3d 1008, 1015 (9th Cir. 2005), the court approved of testimony by a federal probation officer identifying the defendant pictured in a surveillance photograph taken during a bank robbery.

At Beck's trial, in accordance with the trial judge's directive, the officer did not mention his position but only stated that he had a professional relationship with the defendant requiring regular bi-monthly meetings and that as a result of those contacts, he believed the defendant was the person depicted in the bank surveillance photograph. Id. at 1013. The testimony was admitted pursuant to Federal Rules of Evidence 701 and 403, which are analogous to our

23

own Rules of Evidence. See State v. Rinker, 446 N.J. Super. 347, 362 (App. Div. 2016) (noting that because "[t]he Federal Rules of Evidence have been the source of many, although not all, of our Rules of Evidence[,]" we "frequently consider as instructive federal precedent construing analogous Federal Rules of Evidence") (citations omitted).

> The [Beck] court explained that "lay witness testimony is permissible where the witness has had 'sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful.'" Whether that opinion is "helpful," the court continued, depends on various factors including the witness' familiarity with the defendant's appearance when the crime was committed, or with the defendant's manner of dress, if relevant, whether the defendant disguised his appearance during the offense or altered [his] looks before trial, and "whether the witness knew the defendant over time and in a variety of circumstances."
>
> Applying that standard, the Beck court concluded it was not error for a parole officer to opine that the defendant matched a surveillance photo in light of multiple prior contacts between the two individuals.
>
> [Lazo, 209 N.J. at 22-23 (quoting Beck, 418 F.3d at 1015).]

In contrast, in United States v. LaPierre, 998 F.2d 1460 (9th Cir. 1993), the court "found it was error for a police officer to have identified a defendant from a bank surveillance photo because the officer 'not only did not know [defendant], he had never even seen him in person.'" Lazo, 209 N.J. at 23

(quoting LaPierre, 998 F.2d at 1465). Instead, "the officer's knowledge of the defendant's 'appearance was based entirely on his review of photographs of [defendant] and witnesses' descriptions of him.'" Ibid. (quoting LaPierre, 998 F.2d at 1465).

In Lazo, the Court stated that "[c]ourts evaluating whether a law enforcement official may offer a lay opinion on identification [should] also consider, among other factors, whether there are additional witnesses available to identify the defendant at trial." Id. at 23. In addition, courts should "recognize that when there is no change in a defendant's appearance, juries can decide for themselves—without identification testimony from law enforcement -- whether the person in a photograph is the defendant sitting before them." Ibid. Lazo's principles apply equally to the identification of a defendant on video surveillance footage.

Here, at trial, the video surveillance footage,[10] which was approximately three minutes and thirty-six seconds in length, was played for the jury and depicted a man in a crowded casino walking up to one of several machines, inserting a card, entering a sequence of digits, removing the card, inserting a second card, and then playing on the machine. The man repeated the process by

---

[10] We have reviewed the footage supplied on appeal as part of the exhibits.

exchanging the cards to continue playing, ultimately removing the card and the winnings and walking away.

All three witnesses watched the same surveillance footage during their respective testimony and testified as to what they believed the video depicted. Edwards first testified that the video showed the "Bravo Section of the high-limit slot area," based on the "camera coverage" of the casino floor and the displayed "camera number." Edwards identified the machine in question as the "bottom machine" in the video. Edwards then testified that the video showed "a male who is not Joseph Fazzia at th[e] machine, based on the times that Alexis Gonzalez from Security gave [him] . . . . between [7:09 p.m.] and [7:50 p.m.]" Thereafter, Edwards testified that, at the specified times, the person in the video inserted and then removed "a Tropicana [b]lack [c]ard" from the slot machine.

When Edwards specified the time that different actions occurred in the video, defense counsel objected on the ground that the "narration" was unnecessary. The judge overruled the objection, finding that the narration was based on Edwards' perceptions, which were informed by his personal knowledge as security personnel tasked with retrieving the relevant footage from the surveillance department. The judge also determined that the narration would help the jury understand what the video captured, which was not self-evident.

26

We find no abuse of discretion in the judge's evidentiary ruling. Edwards testified that his job duties included monitoring the surveillance cameras to ensure there was "no suspicious activity." Having retrieved the relevant footage, Edwards' testimony was not based solely on the content of the video, but included testimony describing what he "did and saw[.]" McLean, 205 N.J. at 460. Such fact testimony "is an ordinary fact-based recitation by a witness with first-hand knowledge." Ibid. Edwards' narration of the video was also based on his personal perceptions and knowledge of the layout of the casino, the slot machine in question, and the relevant time periods during which Fazzia's card was misappropriated as derived from the casino records. The testimony assisted the jury in understanding Edwards' testimony and in determining a fact in issue. Thus, it constituted permissible lay opinion under Rule 701.

On appeal, defendant challenges Edwards' "inverse identification" testimony, arguing Edwards provided no "foundation for how he knew what . . . Fazzia looked like." However, at trial, defendant's objection addressed Edwards' narration of the video, not the identification.[11] When a defendant raises an issue for the first time on appeal, we review the action or omission complained of for

---

[11]   In fact, when the judge inquired whether it was "an identification issue," defense counsel responded in the negative.

plain error. R. 2:10-2; State v. Macon, 57 N.J. 325, 333 (1971). Under this standard of review, we disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

"Plain error is a high bar . . . ." State v. Santamaria, 236 N.J. 390, 404 (2019). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" Ibid. (quoting State v. Bueso, 225 N.J. 193, 203 (2016)).

> A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court's actions constituted plain error because to rerun a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.
>
> [Id. at 404-05 (alteration in original) (citations omitted); accord State v. Trinidad, 241 N.J. 425, 445 (2020).]

Here, although Edwards should not have been permitted to testify that Fazzia was not the man in the video without a foundation establishing that he

had personal knowledge of Fazzia's appearance, defendant has not sustained his burden of showing that the improper lay opinion testimony raises a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. Significantly, Edwards did not identify or imply that defendant was the individual at the slot machine. Moreover, the jury was able to observe Fazzia when he testified and compare the individual in the video with Fazzia. We therefore find no plain error in Edwards' "inverse identification" of Fazzia in the video.

Next, we address Gonzalez' testimony. Gonzalez testified that when he watched the video, he immediately recognized "the male in the jacket with the white lining in the hood" as defendant. Gonzalez then identified defendant in the courtroom, and confirmed that the video matched what was shown in the slot-machine records. While the video was played in the courtroom, Gonzalez testified that defendant inserted Fazzia's black card into the slot machine and then entered "Fazzia's pin code to download slot play." He testified that "[t]he flash of the screen show[ed] that the slot play ha[d] been accepted." Gonzalez continued that defendant then "removed the [black] card and inserted a gold card into the machine, and continu[ed] to play." According to Gonzalez, the video showed that each time defendant won a hand, "he print[ed] out a voucher for the

amount that the hand has won" before "removing the gold card and leaving the area."

Defense counsel never objected to Gonzalez' identification of defendant on the video or in the courtroom, nor did she object to Gonzalez' narration of the video. For the first time on appeal, defendant argues the testimony violated Rule 701 because there was "[n]o testimony as to whether Gonzalez had seen [defendant] before, or why he was somehow more capable than the jury of matching the person he saw in court with the person in the video." Defendant specifically asserts there was no testimony of Gonzalez' familiarity with defendant "outside the context of this case." The State counters "[h]ad defendant made a timely objection to the foundation, the prosecutor could have explained" that "defendant has a history of committing thefts at Tropicana and Gonzalez knew defendant based on that history, but that such a history was not admissible as it constitute[d] prior bad act evidence." In support, the prosecutor points out that "Gonzalez' familiarity and personal knowledge of defendant was . . . demonstrated by [Gonzalez'] ability to quickly locate defendant in the casino after viewing the video on February 2, 2017."

This is exactly the type of purported error that "could easily have been cured on request," and "to rerun a trial" would "reward the litigant who suffers

an error for tactical advantage . . . ." Ross, 229 N.J. at 407 (quoting State v. Weston, 222 N.J. 277, 294-95 (2015)). See State v. Witt, 223 N.J. 409, 419 (2015) (disallowing a defendant from challenging the lawfulness of a motor vehicle stop for the first time on appeal where the defendant's failure to raise the issue in the trial court deprived the State of "the opportunity to establish a record that might have resolved the issue"). Nonetheless, in determining whether defendant has demonstrated that the alleged error had "a clear capacity to bring about an unjust result[,]" we assess "the overall strength of the State's case." State v. Nero, 195 N.J. 397, 407 (2008) (quoting State v. Chapland, 187 N.J. 275, 288-89 (2006)); see also State v. Sowell, 213 N.J. 89, 107-08 (2013) (affirming conviction given strength of evidence against defendant despite admission of improper expert testimony).

Applying that standard, we find no plain error. Unlike Lazo, Gonzalez' identification was not "the only evidence linking defendant to the crime." Id. at 14. The video depicting the entire criminal episode was presented to the jury. Additionally, by his own admission, defendant acknowledged his presence in the casino as well as his use of another individual's card, albeit a card for which he had allegedly paid. We are also persuaded that the ease with which Gonzalez located defendant in the casino after viewing the video evinces prior familiarity

and personal knowledge sufficient to sustain Gonzalez' identification of defendant on the video in accord with Rule 701 as well as the identification of defendant in the courtroom.

Lastly, we turn to Wheeler's testimony. After confirming that the surveillance footage was the same footage he reviewed during his investigation, while the prosecutor played the video, Wheeler testified that nothing in the video supported defendant's statement made in the holding cell. In that regard, the pertinent direct examination occurred as follows:

> [Prosecutor:] When you watched this surveillance coverage, was there anything in the surveillance . . . that support[ed] the statement . . . defendant stated to you?
>
> [Wheeler:] No.
>
> [Prosecutor:] Why do yo[u] say that?
>
> [Wheeler:] Because right there you see him, he put that card in their machine. When he made his statement he said that he never possessed a card, he said another Asian male would sit behind him and put the card in and access the account.

Defendant characterizes Wheeler's testimony as an improper "implicit identification of [defendant,]" asserting that without establishing any "familiarity with [defendant] outside the context of this case[,]" Wheeler "was clearly referring to [defendant] with his use of the male pronoun." Defendant

continues that it was "improper" to allow Wheeler to testify during his narration that defendant's "statement was a lie," because "[t]he jury viewed the video three times, and was perfectly capable of determining whether it 'support[ed]' [defendant's] statement."

We agree that Wheeler's testimony implicitly identifying defendant in the video constituted inadmissible lay opinion under Rule 701. Wheeler did not personally witness the crime, nor did he have prior interactions with defendant outside of the case. He based his identification on his investigation and his observation of the video, rather than any personal knowledge, and was therefore in no better position than was the jury to draw conclusions about what the video showed. Moreover, the State does not suggest defendant changed his appearance before trial such that his appearance in court was unrecognizable from that in the video.

However, because there was no objection, we again review for plain error and find none for the same reasons expressed in connection with Gonzalez' testimony. Likewise, we reject defendant's contention that the judge's failure to sua sponte instruct the jury on how to assess the identification testimony constitutes plain error. "When identification is a 'key issue,' the trial court must instruct the jury on identification, even if a defendant does not make that

request." State v. Cotto, 182 N.J. 316, 325 (2005). Identification is "[a] key issue in th[e] case" when "[i]t [is] the major, if not the sole, thrust of the defense[.]" State v. Green, 86 N.J. 281, 291 (1981).

Here, identification was not a "key issue" in the case and defendant never contested his appearance in the video. Indeed, defense counsel did not argue misidentification in her opening or closing statement, did not cross-examine the witnesses on identification, and did not object to any witness' identification of defendant. Instead, given defendant's statement, the defense theory throughout the trial was that the State could not demonstrate defendant had acted with the requisite intent. "Therefore, the omission of an instruction on identification was not clearly capable of producing an unjust result" in the circumstances of this case. State v. Coclough, 459 N.J. Super. 45, 52 (App. Div.), certif. denied, 240 N.J. 84 (2019).

IV.

In Point III, defendant argues the judge's failure to sua sponte instruct the jury "on how to evaluate the accuracy of [his] statement as relayed by . . . Wheeler" violated State v. Hampton, 61 N.J. 250, 270-72 (1972) and State v. Kociolek, 23 N.J. 400, 421 (1957). According to defendant, "the proper oral statements charge" was necessary because "Wheeler failed to record

[defendant's] statement, failed to take contemporaneous notes, and did not complete his investigation report until three weeks later."  Defendant continues that the "omission" of the charge "combined with the statement's significance was clearly capable of influencing the jury's deliberations and producing an unjust result."

Because there was no objection in the trial court, defendant "waived the right to challenge the instruction on appeal[,]" State v. Afanador, 151 N.J. 41, 54 (1997) (citing R. 1:7-2), and we therefore again review for "plain error . . . ." Ibid. (citing R. 2:10-2).

> Plain error, in the context of a jury charge, is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [Ibid. (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).]

However, "[t]he mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016).  "To warrant reversal[,] . . . an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).  Nevertheless, "we acknowledge that

'correct jury charges are especially critical in guiding deliberations in criminal matters, [and] improper instructions on material issues are presumed to constitute reversible error.'" Id. at 84 (alteration in original) (quoting Jenkins, 178 N.J. at 361).

Both Kociolek and Hampton, decided fifteen years later, "addressed issues concerning the admissibility of a defendant's oral statements and the instructions that should be given to the jury regarding those statements." Jordan, 147 N.J. at 420. "In [Hampton,] the Supreme Court held that although the trial judge was the sole arbiter of the voluntariness of a defendant's statement, the jury was to be instructed that they should decide whether the statement was true before considering it as evidence." State v. Martinez, 387 N.J. Super. 129, 137 (App. Div. 2006) (citing Hampton, 61 N.J. at 272). "This holding was subsequently codified as N.J.R.E. 104(c)." Ibid.

> [I]n Kociolek the Supreme Court recognized the great impact of testimony that a defendant made an oral incriminating admission as well as its inherent weakness of possible misunderstanding and imperfect recollection. Noting that verbal precision may well depend upon "the presence or absence of a single word [to] substantially alter the true meaning of a single sentence," the Court directed that the jury was to be instructed that they should weigh and consider such testimony with caution.

[Martinez, 387 N.J. Super. at 137 (quoting Kociolek, 23 N.J. at 421-22).]

"In [Jordan], the Supreme Court underscored the need for Hampton and Kociolek instructions in addition to the general credibility charge by holding that the jury should be so charged even if a defendant made no such request." Martinez, 387 N.J. Super. at 137 (citing Jordan, 147 N.J. at 425). "However, . . . failure to instruct in accordance with Hampton or Kociolek absent a request to charge was not reversible error per se but was to be reviewed under the plain error standard." Martinez, 387 N.J. Super. at 137

Here, mirroring the model jury charge, the judge provided the jury with a thorough recitation of the Hampton charge, see Model Jury Charges (Criminal), "Statements of Defendant" (June 14, 2010), as well as the general charge in assessing the credibility of a witness's testimony. See Model Jury Charges (Criminal), "Criminal Final Charge Parts 1 and 2 (General Information to Credibility of Witnesses)" (May 12, 2014). However, the judge did not provide the jury with the Kociolek charge.

In Jordan, the Court noted it would be "a rare case where failure to give a Kociolek charge alone is sufficient to constitute reversible error[.]" 147 N.J. at 428. See id. at 426-27 (listing cases holding "that the lack of a Kociolek charge [does not] constitute[] plain error"). "Ultimately, whether the failure to give a

Kociolek charge is capable of producing an unjust result will depend on the facts of each case." Jordan, 147 N.J. at 428.

Here, given the totality of the evidence presented at trial, the failure to give the Kociolek charge does not have the capacity to bring about an unjust result. Particularly noteworthy in that regard is the fact that defendant relied on the veracity of his statement as part of his defense as well as the fact that a video of the crime, Gonzalez' identification of defendant in the video, and strong additional corroborating evidence was presented to the jury. See State v. Jackson, 289 N.J. Super. 43, 54 n.2 (App. Div. 1996) (noting that "the failure to give a requested Hampton/Kociolek charge concerning a defendant's oral statements" may be harmless error "if the crime had been videotaped and was committed before numerous unimpeachable witnesses with strong additional circumstantial evidence"). Moreover, viewing the charge as a whole, as we are required to do, because the Hampton charge and the general credibility instructions were provided, we find no plain error. See State v. Crumb, 307 N.J. Super. 204, 251 (App. Div. 1997) (viewing "the factual context of the case and the charge as a whole" and finding no plain error in the failure to give a Kociolek charge where the trial court gave "the Hampton charge, along with the general and comprehensive credibility instructions").

38

## V.

In Point IV, defendant asserts "a remand . . . is required to reevaluate the $1300 in restitution" imposed because "[t]here was no factual basis at the trial for the $1300 figure, and there was also no inquiry into the ability of [defendant] to pay such an amount." As to the former, defendant argues that "Fazzia did not suffer a 'loss' . . . because . . . the missing value in his account was quickly replaced by the casino[,]" and "Tropicana did not suffer $1300 in losses" because "the free slot play . . . has no value" and "there was no evidence presented at trial that any of the vouchers were actually redeemed." Regarding the $550 in free slot play, the State counters that "[r]eimbursing . . . free slot play did cause a pecuniary loss to the casino as the casino had to give a second amount of electronic cash to Fazzia." The State explains that while free slot play "is not cash itself," it "operates as electronic cash" and "still possesses pecuniary value, as it allows customers to access and play slot machines that they would otherwise have to pay to use." Regarding the $750 in winning vouchers, the State does not expressly dispute defendant's assertion that there was no evidence presented to support the redemption of the vouchers.

"N.J.S.A. 2C:43-3 provides that the restitution ordered to be paid cannot exceed the loss sustained by the victim." State v. Scribner, 298 N.J. Super. 366,

39

370 (App. Div. 1997). N.J.S.A. 2C:44-2 sets forth the criteria for the imposition of restitution as follows:

> b. The court shall sentence a defendant to pay restitution in addition to a sentence of imprisonment . . . that may be imposed if:
>
> > (1) [t]he victim . . . suffered a loss; and
> >
> > (2) [t]he defendant is able to pay or, given a fair opportunity, will be able to pay restitution.
>
> . . . .
>
> c. (2) [i]n determining the amount and method of payment of restitution, the court shall take into account all financial resources of the defendant, including the defendant's likely future earnings, and shall set the amount of restitution so as to provide the victim with the fullest compensation for loss that is consistent with the defendant's ability to pay.

"In order to impose restitution, a factual basis must exist and there must be an explicit consideration of defendant's ability to pay." Scribner, 298 N.J. Super. at 372. "Indeed, N.J.S.A. 2C:44-2b(2) specifically provides that restitution is an available sanction only if the offender has the present or future ability to pay." Id. at 371. "The sentencing judge has been granted considerable discretion in evaluating a defendant's present or future ability to pay; however, that discretion is not unfettered[,]" and "[t]he sentencing judge must explain the

A-0314-18T4

reasons underlying the sentence, including the decision to order restitution, the amount of the restitution, and its payment terms." Ibid. (citing State v. Newman, 132 N.J. 159, 169-70 (1993)); see also State v. Harris, 70 N.J. 586, 599 (1976) (stating that "statement of reasons" rule extends to imposition of restitution). Further, because "[t]he process of ordering restitution implicates due process rights[,]" "settled law requires the court to conduct at least a summary hearing" prior to imposing restitution. State v. Paladino, 203 N.J. Super. 537, 547 (App. Div. 1985). See State in the Interest of D.G.W., 70 N.J. 488, 501, 503 (1976) (holding that "a summary proceeding" adequately safeguards due process rights implicated in imposition of restitution).

Here, for the first time on appeal, defendant objects to the $1300 restitution amount and contests his ability to pay. At sentencing, the judge imposed the restitution amount requested by the State but made no findings relative to the loss sustained by the victim or defendant's ability to pay restitution. Relying on State v. Orji, 277 N.J. Super. 582 (App. Div. 1994), the State asserts that in the absence of an objection at sentencing, "defendant is not now entitled to demand" a restitution hearing because "there was no good-faith dispute concerning the restitution" and "defendant's ability-to-pay can be inferred based on his history of restaurant employment from 2000 to 2018, his

good health, and his . . . status as a high school graduate" detailed in the pre-sentence investigation report (PSR).

In Orji, "[a]fter a jury trial, [the] defendant was convicted of one count of third degree theft by deception" and sentenced "to a five-year probationary term conditioned upon serving 220 days in the county jail . . . ." 277 N.J. Super. at 584. Without conducting a restitution hearing, the trial court also ordered the defendant to pay $8,408.40 in restitution "as a condition of probation." Ibid. "[W]e recognize[d] due process normally requires a hearing on both the ability to pay and the time period for making restitution[.]" Id. at 589. However, we were satisfied that under the circumstances presented, the trial court was not required to conduct a restitution hearing because the defendant did not dispute the "amount of restitution" or "his ability to pay" over "the five years of probation." Id. at 589-90

We pointed out that

> [t]here was evidence in the [PSR] that defendant has a bachelor's degree in marketing and is gainfully employed as the owner-operator of a limousine-taxi service. From this evidence the judge properly could have inferred that defendant had the ability to pay the restitution ordered. Also, the court gave defendant the maximum probationary sentence, N.J.S.A. 2C:45-2, thereby allowing a maximum duration for payment of restitution.

A-0314-18T4

[Id. at 589.]

On the other hand, in State v. McLaughlin, 310 N.J. Super. 242, 246, 263, 265 (App. Div. 1998), we "remand[ed] the matter for a hearing to determine [the] defendant's ability to pay" where the defendant "argue[d] for the first time on appeal" that "the sentencing court failed to consider his ability to pay" before ordering restitution in conjunction with the imposition of an aggregate "term of ten years with a two[-]year parole disqualifier" following "trial convictions" for theft and forgery related offenses. There, "[t]he trial court ordered restitution in the amount of $271,305.33 . . . representing the amount defendant admitted to have forged in checks" but "made no findings relative to defendant's ability to pay restitution." Id. at 263.

In distinguishing Orji, we explained that "the amount of restitution ordered in Orji was only $ 8,408.40, and the defendant was sentenced to a five-year probationary term . . . ." McLaughlin, 310 N.J. Super. at 264. Additionally, "defense counsel had argued to the trial court that incarceration of Orji would be counterproductive to payment of restitution[.]" Ibid. Further,

> unlike in Orji, there was no mention by defense counsel of the likelihood of defendant paying restitution of $271,000--or any other amount--if not incarcerated.
>
> The sentencing transcript is devoid of any mention of defendant's financial resources and/or his likely future

earnings. Nor does the presentence report contain any information pertaining to defendant's ability to pay--it merely states: "The defendant's income, nor monthly payments toward credit card expenses was indicated. He is currently incarcerated in the Camden County Correctional Facility."

[McLaughlin, 310 N.J. Super. at 264.]

Likewise, in State v. Pessolano, 343 N.J. Super. 464, 478-79 (App. Div. 2001), "we remand[ed] for reconsideration of the restitution award" where the defendant argued for the first time on appeal that "the order of restitution . . . was improper absent a hearing as to ability to pay." There, the defendant "was ordered to pay $140,268.89 in restitution, 'minus any amount paid by co-defendant, Warren Kaye[,]'" in conjunction with an aggregate eight-year sentence of imprisonment following trial convictions for corporate and individual tax evasion and related offenses. Id. at 467-68. We explained that:

> In this case, the judge held no hearing and made no comments during sentencing about defendant's financial status or ability to pay. Moreover, unlike cases such as Orji, defendant "disput[ed]" the amount of restitution, and he was no longer employed, had lost his business, and was about to be incarcerated. Furthermore, the amount of restitution was made subject to an unknown credit for any amount paid by Kaye, and there was no fixed responsibility in terms of the obligation of either defendant.
>
> [Pessolano, 343 N.J. Super. at 479.]

Similarly, here, the judge held no hearing and made no comments during sentencing about defendant's financial status or ability to pay. While the PSR noted that "defendant reported . . . work[ing] for various Chinese restaurants since coming to the [United States] in 2000[,]" at the time defendant was interviewed on June 14, 2018, he was "[u]nemployed," "[i]ncarcerated," and had no assets. Further, although defendant did not expressly dispute the restitution amount at sentencing, in his motion for a new trial adjudicated immediately prior to sentencing, he disputed "the value of [the State's] theft case."[12] Thus, we remand for a hearing to ascertain the actual loss to the victim and to determine defendant's ability to pay restitution. If after the hearing, the trial court decides to award restitution, "it should explain the reasons underlying its decision, including the amount of restitution awarded and the terms of payment." State v. Kennedy, 152 N.J. 413, 425 (1998). See also State v. Martinez, 392 N.J. Super. 307, 321-22 (App. Div. 2007) (remanding for a hearing on the issue of the defendant's ability to pay where, at sentencing, defendant acknowledged the State's proofs regarding his "equity . . . in real estate . . . and . . . salary that he continued to receive through other employment" but "objected to their

---

[12] On the jury verdict sheet, the jury determined that the value of the property stolen "[e]xceed[ed] $500[] but [was] less than $75,000[]."

sufficiency as a basis for a finding that he had an ability to pay the restitution . . . the State sought.").

In sum, we affirm defendant's convictions, but vacate the restitution imposed and remand the matter for a restitution hearing as well as the necessary correction to the JOC to reconcile the oral sentence with the written memorialization.

The judgment of conviction and sentence are affirmed, except as to the restitution ordered, and the matter is remanded for a restitution hearing and correction of the JOC.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION